2013 VT 93

# Leslie Anne Whittington v. Office of Professional Regulation

[87 A.3d 489]

No. 12-058

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed October 25, 2013

*Melvin Fink*, Ludlow, for Appellant.

*Edward G. Adrian*, Chief State Prosecuting Attorney, and *Anastasia Douglas* (On the Brief), Montpelier, for Appellee.

¶ 1. **Robinson, J.** Respondent Leslie Anne Whittington appeals an order by the Office of Professional Regulation (OPR) administrative law officer (ALO) concluding that she committed several acts of unprofessional conduct and sanctioning her to a five-year license suspension. We affirm in part, reverse in part, and remand for a new sanction determination.

¶ 2. Respondent worked as the Nursing Home Administrator (NHA) of the Gill Odd Fellows Home, a skilled nursing facility in Ludlow, from October 2006 until 2010. In its Amended Specification of Charges, the State alleged that respondent committed a host of specified acts that amounted to unprofessional conduct under 3 V.S.A. §§ 127, 129, 129a, 18 V.S.A. chapter 46, the Administrative Rules for Nursing Home Administrators, and the Rules of the Office of Professional Regulation. In particular, the State alleged that respondent engaged in unprofessional conduct by failing to keep the home's supplies adequately stocked; failing

to keep the home adequately staffed; creating an erratic and hostile environment for staff and residents, possibly due to mental or psychological instability; allowing regulatory deficiencies to occur and responding poorly to two regulatory "surveys" (routine inspections or investigations) by the Vermont Division of Licensing and Protection; failing to ensure that residents' records were properly kept; improperly interfering with nurses' delivery of medication to residents and other nursing duties or medical decisions; falsely representing that she is a licensed nursing assistant and is close to earning a nursing degree; and improperly physically removing the ombudsman responsible for the home from the premises.

¶ 3. After ten days of hearings, the ALO issued a lengthy and thoughtful opinion finding that the State had met its burden of proving the following instances of unprofessional conduct:

(1) Respondent interfered with medical diagnosis and treatment on at least three separate occasions — by making a psychiatric diagnosis outside of her area of expertise, questioning the withdrawal of a patient's medications prescribed by her physician, undermining an advance practice nurse's psychiatric diagnosis and a physical therapy assessment for another patient — and thereby engaged in unprofessional conduct and practice beyond her scope of ability and training pursuant to 3 V.S.A. § 129a(a)(13).

(2) Respondent touched and escorted the ombudsman from the facility and threatened her with police action if she did not leave, constituting unprofessional conduct under both 3 V.S.A. § 129a(a)(3) and 129a(b)(2).

(3) Respondent required patients to dress against their wishes in violation of the Vermont Nursing Home Residents' Bill of Rights, 33 V.S.A. § 7301(13).

(4) Respondent created "a hostile work environment where many staff members were

made to feel defensive, fearful, and unable to speak-up concerning patient care which might be perceived as contrary to the wishes of the nursing home administrator" which, in turn, "constituted unsafe and unacceptable patient care and failed to conform to the essential standards of acceptable and prevailing practice" under 3 V.S.A. § 129a(b)(1)-(2).

(5) Respondent's "regular interruption . . . of the nurses during their medication passes" was unprofessional conduct under 3 V.S.A. § 129a(b)(1)-(2).

(6) Deficiencies cited in two annual surveys by the Division of Licensing and Protection demonstrate respondent's unprofessional conduct under 3 V.S.A. § 129a(b).

The ALO explicitly did *not* find respondent mentally ill or psychologically unfit, and otherwise added that "[t]o the extent that other charges were made which have not been addressed in the findings or conclusions . . . the evidence did not rise to the level of proof required."

¶ 4. Noting respondent's strong work ethic and competence in certain areas of her practice as countervailing considerations, and despite the State's request for a one-year license suspension, the ALO imposed a five-year license suspension, indicating that respondent tried to minimize the problems identified in the 2010 survey and refused to "accept responsibility for her actions." Additionally, as a precondition to application for reactivation of respondent's license, the ALO imposed a $5,000 fine, completion of a leadership course, completion of a personnel management course, completion of an effective communication course, and the hiring by respondent of a consultant to "supervise her practice, conduct site visits, both announced and unannounced, and submit monthly reports to the Director [of the OPR] . . . regarding the Respondent's practice." This supervision would last for a minimum of two years.

¶ 5. Respondent appealed the ALO's determination and sanction to the superior court, which affirmed, concluding that the ALO's

findings and conclusions were supported by substantial evidence, and the sanction was within the ALO's discretion.

¶ 6. On appeal to this Court, respondent challenges each of the ALO's determinations that she had engaged in unprofessional conduct and also argues that the sanction was unduly harsh.[1]

## I.

¶ 7. We have described the standard of review in these types of cases as follows: "Where there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal. We therefore review the ALO's decision independent of the superior court's findings and conclusions." *Devers-Scott v. Office of Prof'l Regulation*, 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230 (quotation and citation omitted).

¶ 8. We test findings of fact by a substantial evidence standard:

> We affirm the factual findings of administrative tribunals when they are supported by substantial evidence. Evidence is substantial if, in looking at the whole record, it is relevant and a reasonable person could accept it as adequate. This Court will not, upon its review of the evidence, reweigh conflicting evidence. Rather, we defer to the finder of fact when there is conflicting evidence in the record.

*Id.* ¶ 6 (quotations and citation omitted). By contrast, because the ALO is not like a specialty board with particular expertise in the field of nursing home administration, our review of the ALO's legal conclusions is de novo. *Id.* ¶ 9.

## A.

¶ 9. We begin by reviewing the ALO's factual findings and legal conclusions challenged by respondent. We turn first to the three instances in which the ALO concluded that respondent performed services beyond her education and training as a nursing home administrator. "Performing treatments or providing services which

---

[1] To the extent that respondent challenges the ALO's or the superior court's findings and conclusions of law as relying on the allegation that she is psychologically unfit to practice, the ALO explicitly found that there was no evidence that respondent had been diagnosed with a psychological impairment.

the licensee is not qualified to perform or which are beyond the scope of the licensee's education, training, capabilities, experience, or scope of practice" constitutes unprofessional conduct. 3 V.S.A. § 129a(a)(13). In our review, we must ask whether there is substantial evidence supporting the particular finding, and whether that evidence supports the ALO's conclusion.

¶ 10. The first incident involves respondent's request that a doctor continue treating a dying patient with a diuretic that had been terminated. The ALO found that following discussions with the patient and her family, a doctor discontinued a particular medication that had been removing fluid from the patient's lungs. Respondent later asked nursing staff to contact the doctor to tell him he needed to restart the medication. The doctor immediately went to the nursing home, and respondent told him that the patient wanted to live. The doctor explained that the medication decision was made in consultation with the patient and the patient's family, but, seeing respondent's uneasiness, spoke to the patient again with respondent present. The patient directed that the medication stop. The doctor felt that respondent was inappropriately recommending specific medications for the patient. These ALO findings are supported by the doctor's testimony.

¶ 11. ▇ ▇ However, taking into account the incident as it is described in the ALO's finding, these factual findings do not support the conclusion that respondent attempted to interfere with medical management in a manner that supports professional sanction. Respondent did not purport to recommend a specific medication to treat a particular condition; the issue here was the withdrawal of life-sustaining care. There was no evidence to suggest that prior to conferring with the doctor respondent understood that the patient wanted to discontinue life-sustaining treatment. There is no evidence that, once the patient affirmed a desire to stop the medication, respondent persisted in her advocacy. Nor is there evidence that respondent sought to administer medication herself or instructed someone else to do so. Instead, the evidence and findings show that respondent saw the withdrawal of life-sustaining care and instructed medical staff to contact the prescribing physician. The doctor's feeling that respondent's intervention was inappropriate does not itself support a finding that she committed a discipline-worthy infraction. The legal restriction against "[p]erforming treatments or providing services," 3 V.S.A. § 129a(a)(13), beyond a nursing home adminis-

trator's qualifications is not so broad as to preclude patient advocacy, such as reasonably questioning doctors about the withdrawal of life-sustaining care. To construe the statute otherwise would be to discourage a level of engagement concerning life-or-death matters that is appropriate for a nursing home administrator, even if her concerns ultimately proved ill-founded. We conclude that this incident does not constitute unprofessional conduct.

¶ 12. ■ ■ The second incident involves respondent telling a psychiatric nurse practitioner to diagnose a violent and agitated resident with bipolar disorder so that the resident would be moved to a psychiatric facility. This finding was supported by the psychiatric nurse's testimony that respondent "asked [her] to diagnose [the patient] with an illness that would facilitate [the patient] being seen in a psychiatric hospital." Any countervailing evidence that respondent did not intervene in diagnostic decisions goes to the weight of the evidence, a question strictly within the province of the factfinder. See *Evans Grp., Inc. v. Foti*, 2012 VT 77, ¶ 16, 192 Vt. 311, 59 A.3d 744 (leaving to factfinder issues of weight and credibility). The ALO's conclusion that respondent acted outside her license qualifications by purporting to provide a diagnosis and get the diagnosis recorded by an appropriately licensed professional was supported by this finding, and the underlying record. Respondent's concern for other residents and staff might warrant some action, but does not justify asserting and directing the nurse to document a specific diagnosis.

¶ 13. ■ ■ The third instance involves a doctor's prescription for a physical therapy assessment for a patient. The ALO found that respondent told the patient that he did not need the assessment and should not have it. Respondent denied this, but the ALO found the countervailing testimony more credible. We will not second-guess credibility determinations, and conclude that the ALO's finding on this point was supported by substantial evidence. This conduct — telling a patient that he did not need doctor-recommended care — exceeded the scope of respondent's training and qualifications, and supports the ALO's finding of unprofessional conduct.

¶ 14. ■ Although not an independent basis for an unprofessional conduct violation, the ALO made a background finding that respondent "appeared to have an inflated view of her role concerning nursing activities at the home," and pointed to mis-

representations by respondent concerning her professional credentials. The ALO found that respondent told three witnesses that she had enrolled in nursing school and was "six credits away from having [her] nursing degree," despite never having enrolled in nursing school. Respondent does not directly challenge the finding that she, in fact, told these witnesses that she was enrolled in a nursing degree program, but ·rather challenges the credibility of the evidence and the ALO's conclusion. To the extent that respondent challenges the credibility of the witnesses who testified, this is a matter squarely within the province of the factfinder.[2] See id.

## B.

¶ 15. The remaining charges implicate a separate basis for discipline: failing to practice competently. The statute, 3 V.S.A. § 129a(b), provides that a "[f]ailure to practice competently by reason of any cause on a single occasion or on multiple occasions" can "constitute unprofessional conduct, whether actual injury to a client, patient, or customer has occurred." "Failure to practice competently . . . includes: (1) performance of unsafe or unacceptable patient or client care; or (2) failure to conform to the essential standards of acceptable and prevailing practice." Id. § 129a(b)(1)-(2).

¶ 16. First, we address the cited violation regarding respondent's conduct toward the nursing home ombudsman. The ALO found that when the ombudsman came to the home to address a complaint regarding the placement of a soda machine, respondent "grasped [her] right arm and forcibly walked her out of the building." After the ombudsman reentered the building to deal with the patients' concerns, respondent told her to leave and threatened to call the police if she refused. These findings are

_____

[2] Respondent argues that the ALO's finding on this point was based on the speculative comments of a witness. Insofar as the finding was supported by the testimony of other witnesses, including respondent herself, and given that the ALO did not predicate a specific unprofessional conduct determination on this finding, we find no error in the ALO's conclusion.

Respondent also argues that the evidence does not support the ALO's conclusion that respondent improperly interceded in a resident's skin treatment. However, respondent does not point us to a particular finding in the ALO's order, and we cannot locate any such finding. Because it appears that the ALO did not make such a finding, and did not base an unprofessional conduct determination on such a finding, we do not address respondent's arguments.

supported by the record, in which the ombudsman testified that on two separate occasions when she was investigating patient complaints, respondent asked her to leave and physically escorted her from the facility. These findings, in turn, support the ALO's conclusion that this conduct violated the statute. In addition to relying on expert testimony identifying this conduct as unprofessional conduct, the ALO found that respondent's conduct with regard to the ombudsman violated state and federal laws. See 3 V.S.A. § 129a(a)(3) (defining one type of unprofessional conduct as "[f]ailing to comply with provisions of federal or state statutes or rules governing the practice of the profession"); 33 V.S.A. § 7504(2) (providing that "long-term care facilities shall provide the State Ombudsman access to their facilities"); id. § 7508 (making it a crime to intentionally hinder ombudsman). Thus, we find support for the ALO's conclusion that respondent engaged in unprofessional conduct by interfering with the ombudsman's visit.

¶ 17. ■ Second, the ALO found that respondent forced a dying patient on "comfort care" to change clothing against the patient's wishes and had a resident placed in a chair when the resident wished to remain in bed. The record contains evidence supporting both of these factual findings: On several occasions, respondent . ordered patients dressed or positioned in a particular manner that could cause discomfort and was against the patient's wishes. Respondent does not directly challenge the factual findings, but instead points to countervailing testimony that her policy of requiring certain attire was for the benefit of patients. On the basis of the evidence presented, the ALO's conclusion that respondent engaged in unprofessional conduct was not error. The ALO essentially found that respondent overrode patient autonomy and required that patients be dressed in ways that could or did cause them discomfort. See 33 V.S.A. § 7301(2)(I) (emphasizing primacy of patient dignity and individuality); id. § 7301(2)(M) (specifically describing patient's right to retain and use patient's personal clothing); 3 V.S.A. § 129a(b) (failure to practice competently can constitute unprofessional conduct *"whether actual injury to a client, patient, or customer has occurred"* (emphasis added)).

¶ 18. ■ ■ Third, the ALO found that respondent acted in violation of 3 V.S.A. § 129a(b) by creating a hostile work environment. We note at the outset that creating a "hostile work

environment," while potentially grounds for discipline by an employer, does not necessarily constitute a violation of professional standards that supports professional disciplinary action such as suspension or revocation of a professional license. The focus of the licensing statutes is public protection and patient care, and the disciplinary process should not be expanded to encompass workplace conflicts among staff or other matters within the province of personnel management within a facility that do not implicate patient care. See, e.g., *In re Smith*, 169 Vt. 162, 172, 730 A.2d 605, 612 (1999) ("[T]he purpose underlying governmental regulation of the nursing profession is safeguarding the 'life and health of the people of this state.'" (quoting 26 V.S.A. § 1571)); see also Board of Examiners for Nursing Home Administrators; Administrative Rules § 1.1, 9 Code of Vt. Rules 04 030 180-01, available at http://www.lexisnexis.com/hottopics/codeofvtrules/ (noting that 18 V.S.A. ch. 46, governing OPR licensing of NHAs, gives the OPR Director "certain powers and duties to protect the public health, safety, and welfare by regulating nursing home administrators"). Nor should the professional discipline process be used as a pretext, a substitute for, or alternative to, employment laws that define and enforce the rights of employers and employees. Simply put, being a bad manager — even a temperamental, unpredictable, harsh, and demanding one — might not necessarily constitute unprofessional conduct for the purposes of state disciplinary action against a licensed nursing home administrator.

¶ 19. The State argues, though, that in this case the workplace environment created by respondent was *so* hostile to subordinates that it compromised, or at least potentially compromised, patient care. Respondent does not challenge the sufficiency of the evidence underlying the ALO's factual findings regarding the work environment, but instead offers countervailing evidence that contradicts the ALO's findings. The factfinder has ultimate discretion in determining issues of credibility and weighing the evidence to come to a factual conclusion. *Evans Grp.*, 2012 VT 77, ¶ 16.

¶ 20. Respondent *does* challenge the ALO's conclusion that her behavior in creating a hostile work environment constitutes a violation of the statute sanctioning unprofessional conduct. The ALO's findings support the conclusion that in this case the environment respondent created is appropriate for a finding of

professional misconduct. Some of the conduct identified by the ALO that did or could have affected patient care includes "going off" on staff in public areas and yelling at a staff member in a resident's area. The ALO's findings on this subject — which are supported by the evidence — paint a picture of abusive conduct toward staff members that was sufficiently frequent and public that the ALO had a sufficient basis to conclude that respondent's treatment of staff members impacted patient well-being. Mistreatment of staff, patients or visitors can constitute grounds for discipline if it rises to the level that it threatens the health, safety and welfare of patients.

¶ 21. The fourth category of incidents found by the ALO to constitute unprofessional conduct pursuant to 3 V.S.A. § 129a(b)(1)-(2) involves respondent interrupting "medication passes." One of the functions of nurses within a nursing home is the delivery, or "passing," of medications. A "medication pass" involves delivery of the appropriate medications to each patient who is due for medications at a particular interval; the ALO explained that because the medications for each resident vary and because there may be numerous and diverse medications for each resident, the delivery of the medications can be a time-consuming process, and must be undertaken carefully and within certain timing parameters. The ALO identified multiple instances in which respondent interrupted nurses' medication passes, causing delay. The record amply supports these findings.

¶ 22. Again, respondent does not directly challenge these findings, but rather offers countervailing evidence. Her primary challenge is that the interruptions were infrequent, brief, and nondetrimental to patient care. The State offered competent expert testimony to the contrary sufficient to support the ALO's conclusion that the medication pass interruptions constituted unprofessional conduct, especially given the repeated complaints.[3]

¶ 23. Finally, the ALO found that the Division of Licensing and Protection had identified a number of deficiencies with the nursing home in the context of a regular review. The ALO based a determination that respondent had engaged in unprofessional

---

[3] We recognize respondent's hearsay objection — that the testimony of some witnesses on this point was based, at least in part, on complaints from others. However, the first-hand accounts from nurses who were personally interrupted during medication passes are sufficient to support the ALO's findings.

conduct on these institutional deficiencies. Although the ALO considered respondent's response to two of the cited deficiencies — one involving a revised recreation plan and another involving a medication overdose — it did not specifically find that respondent was responsible for their occurrence, but instead held her liable on the basis that administrators are charged with general administration of the home and are thus responsible for all that occurs there. In so concluding, the ALO relied on *In re Carleton*, No. NH 02-1006 (Sept. 24, 2009), http://www.vtprofessionals.org/opr1/oprdocs/all/NH02-1006.pdf, an administrative decision by the Secretary of State. The State argued as much to the ALO: "[T]his hearing authority has already decided — and I'm using the word 'per se,' but that — that a survey with adverse outcomes is essentially per se failing to abide by the essential standards and practice of the profession."

¶ 24. ■ ■ Respondent does not contest that the survey occurred and that deficiencies were found. She does, however, argue that these deficiencies cannot be grounds for a violation. We disagree that deficiencies can never be grounds for discipline, but agree with respondent that, in this instance, she cannot be subjected to professional discipline and penalties on account of the deficiencies here. The ALO could possibly have relied on specific actions by respondent in *responding* to the deficiencies, but purported to go further by resting the disciplinary consequences for the deficiencies on respondent's general responsibility for the goings-on at the facility. The ALO could assuredly prescribe disciplinary sanctions for deficiencies to the extent they are tied to an administrator's actions or omissions — direct or supervisory — but it cannot presume a violation of professional standards merely from the fact that a deficiency exists. See *In re Porter*, 2012 VT 97, ¶ 16, 192 Vt. 601, 70 A.3d 915 (holding that finding of medical doctor's professional misconduct based on physician assistant's actions was improper where conduct not linked to doctor's actions or inadequate supervision). Like the statute regulating the doctor's conduct in *Porter*, the statute regulating respondent's conduct sets out a detailed list of fifteen bases for finding "unprofessional conduct" on the part of a nursing home administrator. None of these bases includes a Division of Licensing and Protection finding of deficiency, a process closely bound with nursing home administration and therefore easily includable if the Legislature so intended. 3 V.S.A. § 129a. Moreover, the ALO did not

make any findings to suggest that the specific deficiencies identified in the survey and upon which the ALO relied reflected a violation of a professional obligation by respondent. Although the NHA has overall responsibility for the facility, and respondent has professional obligations in discharging her oversight responsibilities, she is not automatically liable in disciplinary proceedings for deficiencies in the facility without more. For this reason, on the record before us, we conclude that the deficiencies cited by the ALO cannot stand as a basis for a determination of respondent's unprofessional conduct.[4]

## II.

¶ 25. ▆▆ We turn now to the five-year license-suspension sanction that the ALO imposed. With respect to sanctions, an "ALO has discretion to impose an appropriate sanction if there is a showing of unprofessional conduct." *Devers-Scott*, 2007 VT 4, ¶ 10 (quotation omitted). Although an ALO's sanction determination is reviewed for abuse of discretion, "[w]e will examine a nonexpert ALO's sanction determination more closely than we would the same determination by an expert board." *Id.* The ALO in this case is not an expert board; thus, we review the ALO's discretionary determinations with a higher degree of scrutiny.

¶ 26. Because we have stricken two of the findings of unprofessional conduct upon which the ALO's sanction was based — the determinations predicated on respondent's questioning a physician's withdrawal of life-sustaining treatment and on identified institutional deficiencies — remand for redetermination of respondent's sanction is appropriate in any event. We address the proportionality of the sanction here for consideration by the ALO on remand.

¶ 27. In this case, OPR requested a one-year license suspension, yet the ALO elected to suspend respondent's license for five years. Although the ALO cites respondent's failure to accept responsibility as the reason for the longer suspension (we agree

---

[4] Respondent also argues in her brief that the charges lodged against her "ignore . . . the Herculean leadership task that [she] has performed since October 2006 to keep the nursing home open and to make it safe and solvent." The ALO acknowledged the strides respondent made at the home, and expressly considered respondent's positive efforts in determining the appropriate sanction: "But for the strong showing of competence by [respondent] in some areas of practice and her strong work ethic, license revocation would be the likely remedy in this case."

with the ALO's emphasis on this consideration where here a fundamental change is needed in respondent's temperament and approach to her management responsibilities), OPR's sanction request had the information to take this into account. Although the hearing officer is not necessarily bound by the parties' requests, and may exercise reasonable discretion to impose a sanction outside of the boundaries defined by the parties' respective requests, a full-blown suspension five times as long as that requested by the State raises red flags.

¶ 28. Moreover, of the other cases involving nursing home administrators who have faced disciplinary proceedings in Vermont, the sanction in this case appears to be an outlier.[5] As a practical matter, a five year license suspension is tantamount to a revocation, as it essentially forces respondent to change careers — at least temporarily. We reiterate our concern that the professional disciplinary process not be used as a means for punishing people with bad interpersonal or managerial skills but, rather, be limited in its scope to reasonable public protection.

¶ 29. Thus, we reverse the ALO's determinations that respondent engaged in unprofessional conduct by questioning a doctor's withdrawal of life-sustaining treatment and on account of the Division of Licensing and Protection survey deficiencies, affirm the ALO's other findings of unprofessional conduct, and remand to the trial court for remand to the ALO for redetermination of the applicable sanction.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*

---

[5] We acknowledge the limitations of this kind of comparison. Every case is different, and the vast majority of the approximately dozen other nursing home administrators who have faced sanctions have stipulated. But we note that most nursing home administrators who have faced sanctions — including for conduct more directly threatening to patient well-being than respondent's — have faced far less punitive sanctions, focusing on license conditions and monitoring rather than outright suspension for multiple years.