2013 VT 93



Whittington v. Office of
Professional Regulation (2012-058)

 

2013 VT 93

 

[Filed 25-Oct-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 93
 
  


 No. 2012-058
 
  


 Leslie Anne Whittington
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
 v.
 
 
 Superior Court, Washington Unit,
 
 
  
 
 
 Civil Division
 
 
  
 
 
  
 
 
 Office of Professional
 Regulation
 
 
 FebruaryTerm, 2013
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Michael
 S. Kupersmith, J.
 
 
  
 
 Melvin Fink, Ludlow, for Appellant.

 

Edward G. Adrian, Chief State Prosecuting Attorney, and
Anastasia Douglas (On the Brief),

  Montpelier, for Appellee.

 

 

PRESENT:  Reiber, C.J., Dooley, Skoglund, Burgess and
Robinson, JJ.

 

 

¶ 1.            
ROBINSON, J.   Respondent Leslie Anne Whittington
appeals an order by the Office of Professional Regulation (OPR) administrative
law officer (ALO) concluding that she committed several acts of unprofessional
conduct and sanctioning her to a five-year license suspension.  We affirm
in part, reverse in part, and remand for a new sanction determination.

¶ 2.            
Respondent worked as the Nursing Home Administrator (NHA) of the Gill
Odd Fellows Home, a skilled nursing facility in Ludlow, from October 2006 until
2010.  In its Amended Specification of Charges, the State alleged that
respondent committed a host of specified acts that amounted to unprofessional
conduct under 3 V.S.A. §§ 127, 129, 129a, 18 V.S.A. Chapter 46, the
Administrative Rules for Nursing Home Administrators, and the Rules of the
Office of Professional Regulation.  In particular, the State alleged that
respondent engaged in unprofessional conduct by failing to keep the home’s
supplies adequately stocked; failing to keep the home adequately staffed;
creating an erratic and hostile environment for staff and residents, possibly
due to mental or psychological instability; allowing regulatory
deficiencies to occur and responding poorly to two regulatory “surveys”
(routine inspections or investigations) by the Vermont Division of Licensing
and Protection; failing to ensure that residents’ records were properly kept;
improperly interfering with nurses’ delivery of medication to residents and
other nursing duties or medical decisions; falsely representing that she
is a licensed nursing assistant and is close to earning a nursing degree; and
improperly physically removing the ombudsman responsible for the home from the
premises.

¶ 3.            
After ten days of hearings, the ALO issued a lengthy and thoughtful
opinion finding that the State had met its burden of proving the following
instances of unprofessional conduct: 

(1)      Respondent
interfered with medical diagnosis and treatment on at least three separate
occasions—by making a psychiatric diagnosis outside of her area of expertise,
questioning the withdrawal of a patient’s medications prescribed by her
physician, undermining an advance practice nurse’s psychiatric diagnosis and a
physical therapy assessment for another patient—and thereby engaged in
unprofessional conduct and practice beyond her scope of ability and training
pursuant to 3 V.S.A. § 129a(a)(13).

 

(2)      Respondent
touched and escorted the ombudsman from the facility and threatened her with
police action if she did not leave, constituting unprofessional conduct under
both 3 V.S.A. § 129a(a)(3) and 129a(b)(2).

 

(3)      Respondent
required patients to dress against their wishes in violation of the Vermont
Nursing Home Residents’ Bill of Rights, 33 V.S.A. § 7301(13).

 

(4)      Respondent
created “a hostile work environment where many staff members were made to feel
defensive, fearful, and unable to speak-up concerning patient care which might
be perceived as contrary to the wishes of the nursing home administrator”
which, in turn, “constituted unsafe and unacceptable patient care and failed to
conform to the essential standards of acceptable and prevailing practice” under
3 V.S.A. § 129a(b)(1)-(2).

 

(5)      Respondent’s
“regular interruption . . . of the nurses during their
medication passes” was unprofessional conduct under 3 V.S.A.
§ 129a(b)(1)-(2).

 

(6)      Deficiencies
cited in two annual surveys by the Division of Licensing and Protection
demonstrate respondent’s unprofessional conduct under 3 V.S.A. § 129a(b).

 

 

The ALO explicitly did not find
respondent mentally ill or psychologically unfit, and otherwise added that
“[t]o the extent that other charges were made which have not been addressed in
the findings or conclusions . . . the evidence did not rise to
the level of proof required.”

¶ 4.            
Noting respondent’s strong work ethic and competence in certain areas of
her practice as countervailing considerations, and despite the State’s request
for a one-year license suspension, the ALO imposed a five-year license
suspension, indicating that respondent tried to minimize the problems
identified in the 2010 survey and refused to “accept responsibility for her
actions.”  Additionally, as a precondition to application for
reactivation of respondent’s license, the ALO imposed a $5,000 fine, completion
of a leadership course, completion of a personnel management course, completion
of an effective communication course, and the hiring by respondent of a
consultant to “supervise her practice, conduct site visits, both announced and
unannounced, and submit monthly reports to the Director [of the
OPR] . . . regarding the Respondent’s practice.”   This
supervision would last for a minimum of two years.

¶ 5.            
Respondent appealed the ALO’s determination and sanction to the superior
court, which affirmed, concluding that the ALO’s findings and conclusions were
supported by substantial evidence, and the sanction was within the ALO’s
discretion.  

¶ 6.            
On appeal to this Court, respondent challenges each of the ALO’s
determinations that she had engaged in unprofessional conduct and also argues
that the sanction was unduly harsh.[1]

I.

¶ 7.            
We have described the standard of review in these types of cases as
follows: “Where there is an intermediate level of appeal from an administrative
body, we review the case under the same standard as applied in the intermediate
appeal.  We therefore review the ALO’s decision independent of the
superior court’s findings and conclusions.”  Devers-Scott v. Office of
Prof’l Regulation, 2007 VT 4, ¶ 4, 181 Vt. 248, 918 A.2d 230
(quotation and citation omitted).  

¶ 8.            
We test findings of fact by a substantial evidence standard:

We
affirm the factual findings of administrative tribunals when they are supported
by substantial evidence.  Evidence is substantial if, in looking at the
whole record, it is relevant and a reasonable person could accept it as
adequate.  This Court will not, upon its review of the evidence, reweigh
conflicting evidence.  Rather, we defer to the finder of fact when there
is conflicting evidence in the record.

 

Id. ¶ 6 (quotations
and citation omitted).  By contrast, because the ALO is not like a
specialty board with particular expertise in the field of nursing home
administration, our review of the ALO’s legal conclusions is de novo.  Id.
¶ 9.

A.

¶ 9.            
We begin by reviewing the ALO’s factual findings and legal conclusions
challenged by respondent.  We turn first to the three instances in which
the ALO concluded that respondent performed services beyond her education and
training as a nursing home administrator.  “Performing treatments or
providing services which the licensee is not qualified to perform or which are
beyond the scope of the licensee’s education, training, capabilities,
experience, or scope of practice” constitutes unprofessional conduct.  3
V.S.A. § 129a(a)(13).  In our review, we must ask whether there is
substantial evidence supporting the particular finding, and whether that
evidence supports the ALO’s conclusion.

¶ 10.        
The first incident involves respondent’s request that a doctor continue
treating a dying patient with a diuretic that had been terminated.  The
ALO found that following discussions with the patient and her family, a doctor
discontinued a particular medication that had been removing fluid from the
patient’s lungs.  Respondent later asked nursing staff to contact the
doctor to tell him he needed to restart the medication.  The doctor
immediately went to the nursing home, and respondent told him that the patient
wanted to live.  The doctor explained that the medication decision was
made in consultation with the patient and the patient’s family, but, seeing
respondent’s uneasiness, spoke to the patient again with respondent
present.  The patient directed that the medication stop.  The doctor
felt that respondent was inappropriately recommending specific medications for
the patient.  These ALO findings are supported by the doctor’s testimony.

¶ 11.        
However, taking into account the incident as it is described in the
ALO’s finding, these factual findings do not support the conclusion that
respondent attempted to interfere with medical management in a manner that
supports professional sanction.  Respondent did not purport to recommend a
specific medication to treat a particular condition; the issue here was the
withdrawal of life-sustaining care.  There was no evidence to suggest that
prior to conferring with the doctor, respondent understood that the patient
wanted to discontinue life-sustaining treatment.  There is no evidence
that, once the patient affirmed a desire to stop the medication, respondent
persisted in her advocacy.  Nor is there evidence that respondent sought
to administer medication herself or instructed someone else to do so. 
Instead, the evidence and findings show that respondent saw the withdrawal of
life-sustaining care and instructed medical staff to contact the prescribing
physician.  The doctor’s feeling that respondent’s intervention was
inappropriate does not itself support a finding that she committed a
discipline-worthy infraction.  The legal restriction against “[p]erforming
treatments or providing services,” 3 V.S.A. § 129a(a)(13), beyond a
nursing home administrator’s qualifications is not so broad as to preclude
patient advocacy, such as reasonably questioning doctors about the withdrawal
of life-sustaining care.  To construe the statute otherwise would be to
discourage a level of engagement concerning life-or-death matters that is
appropriate for a nursing home administrator, even if her concerns ultimately
proved ill-founded.  We conclude that this incident does not constitute
unprofessional conduct.

¶ 12.        
The second incident involves respondent telling a psychiatric nurse
practitioner to diagnose a violent and agitated resident with bipolar disorder
so that the resident would be moved to a psychiatric facility.  This
finding was supported by the psychiatric nurse’s testimony that respondent
“asked [her] to diagnose [the patient] with an illness that would facilitate
[the patient] being seen in a psychiatric hospital.”  Any countervailing
evidence that respondent did not intervene in diagnostic decisions goes to the
weight of the evidence, a question strictly within the province of the fact
finder.  See Evans Grp., Inc. v. Foti, 2012 VT 77, ¶ 16, 192
Vt. 311, 59 A.3d 744 (leaving to factfinder issues of weight and
credibility).  The ALO’s conclusion that respondent acted outside her
license qualifications by purporting to provide a diagnosis and get the
diagnosis recorded by an appropriately licensed professional was supported by
this finding, and the underlying record.  Respondent’s concern for other
residents and staff might warrant some action, but does not justify asserting
and directing the nurse to document a specific diagnosis.  

¶ 13.        
The third instance involves a doctor’s prescription for a physical
therapy assessment for a patient.  The ALO found that respondent told the
patient that he did not need the assessment and should not have it. 
Respondent denied this, but the ALO found the countervailing testimony more
credible.  We will not second-guess credibility determinations, and
conclude that the ALO’s finding on this point was supported by substantial
evidence.  This conduct—telling a patient that he did not need
doctor-recommended care—exceeded the scope of respondent’s training and
qualifications, and supports the ALO’s finding of unprofessional conduct.

¶ 14.        
Although not an independent basis for a unprofessional conduct
violation, the ALO made a background finding that respondent “appeared to have
an inflated view of her role concerning nursing activities at the home,” and
pointed to misrepresentations by respondent concerning her professional
credentials.  The ALO found that respondent told three witnesses that she
had enrolled in nursing school and was “six credits away from having [her]
nursing degree,” despite never having enrolled in nursing school. 
Respondent does not directly challenge the finding that she, in fact, told
these witnesses that she was enrolled in a nursing degree program, but rather
challenges the credibility of the evidence and the ALO’s conclusion.  To
the extent that respondent challenges the credibility of the witnesses who
testified, this is a matter squarely within the province of the factfinder.[2]  See id.



 

 

B.

¶ 15.        
The remaining charges implicate a separate basis for discipline: failing
to practice competently.  The statute, 3 V.S.A. § 129a(b), provides
that a “[f]ailure to practice competently by reason of any cause on a single
occasion or on multiple occasions” can “constitute unprofessional conduct,
whether actual injury to a client, patient, or customer has occurred.” 
“Failure to practice competently includes: (1) performance of unsafe or
unacceptable patient or client care; or (2) failure to conform to the essential
standards of acceptable and prevailing practice.”  Id. § 129a(b)(1)-(2).


¶ 16.        
First, we address the cited violation regarding respondent’s conduct
toward the nursing home ombudsman.  The ALO found that when the ombudsman
came to the home to address a complaint regarding the placement of a soda
machine, respondent “grasped [her] right arm and forcibly walked her out of the
building.”  After the ombudsman reentered the building to deal with the
patients’ concerns, respondent told her to leave and threatened to call the
police if she refused.  These findings are supported by the record, in
which the ombudsman testified that on two separate occasions when she was
investigating patient complaints, respondent asked her to leave and physically
escorted her from the facility.  These findings, in turn, support the ALO’s
conclusion that this conduct violated the statute.  In addition to relying
on expert testimony identifying this conduct as unprofessional conduct, the ALO
found that respondent’s conduct with regard to the ombudsman violated state and
federal laws.  See 3 V.S.A. § 129a(a)(3) (defining one type of
unprofessional conduct as “[f]ailing to comply with provisions of federal or
state statutes or rules governing the practice of the profession”); 33 V.S.A.
§ 7504(2) (providing that “long-term care facilities shall provide the
state ombudsman access to their facilities”); id. § 7508 (making it
a crime to intentionally hinder ombudsman).  Thus, we find support for the
ALO’s conclusion that respondent engaged in unprofessional conduct by
interfering with the ombudsman’s visit.

¶ 17.        
Second, the ALO found that respondent forced a dying patient on “comfort
care” to change clothing against the patient’s wishes and had a resident placed
in a chair when the resident wished to remain in bed.  The record
contains evidence supporting both of these factual findings: On several
occasions, respondent ordered patients dressed or positioned in a particular
manner that could cause discomfort and was against the patient’s wishes. 
Respondent does not directly challenge the factual findings, but instead points
to countervailing testimony that her policy of requiring certain attire was for
the benefit of patients.  On the basis of the evidence presented, the
ALO’s conclusion that respondent engaged in unprofessional conduct was not
error.  The ALO essentially found that respondent overrode patient
autonomy and required that patients be dressed in ways that could or did cause
them discomfort.  See 33 V.S.A. § 7301(2)(I) (emphasizing primacy of
patient dignity and individuality); id. § 7301(2)(M) (specifically
describing patient’s right to retain and use patient’s personal clothing); 3
V.S.A. § 129a(b) (failure to practice competently can constitute
unprofessional conduct “whether actual injury to a client, patient, or
customer has occurred” (emphasis added)).   

¶ 18.        
Third, the ALO found that respondent acted in violation of 3 V.S.A.
§ 129a(b) by creating a hostile work environment.  We note at
the outset that creating a “hostile work environment,” while potentially grounds
for discipline by an employer, does not necessarily constitute a violation of
professional standards that supports professional disciplinary action such as
suspension or revocation of a professional license.  The focus of the
licensing statutes is public protection and patient care, and the disciplinary
process should not be expanded to encompass workplace conflicts among staff or
other matters within the province of personnel management within a facility
that do not implicate patient care.  See, e.g., In re Smith, 169
Vt. 162, 172, 730 A.2d 605, 612 (1999) (“[T]he purpose underlying governmental
regulation of the nursing profession is safeguarding the ‘life and health of
the people of the state.’ ” (quoting 26 V.S.A. § 1571)); see also
Board of Examiners for Nursing Home Administrators; Administrative Rules
§ 1.1, 9 Code of Vt. Rules 04 030 180-01, available at
http://www.lexisnexis.com/hottopics/codeofvtrules/ (noting that 18 V.S.A. Ch.
46, governing OPR licensing of NHAs, gives the OPR Director “certain powers and
duties to protect the public health, safety, and welfare by regulating nursing
home administrators”).  Nor should the professional discipline process be
used as a pretext, a substitute for, or alternative to, employment laws that
define and enforce the rights of employers and employees.  Simply put,
being a bad manager—even a temperamental, unpredictable, harsh, and demanding
one—might not necessarily constitute unprofessional conduct for the purposes of
state disciplinary action against a licensed nursing home administrator.  

¶ 19.        
The State argues, though, that in this case the workplace environment
created by respondent was so hostile to subordinates that it
compromised, or at least potentially compromised, patient care. 
Respondent does not challenge the sufficiency of the evidence underlying the
ALO’s factual findings regarding the work environment, but instead offers
countervailing evidence that contradicts the ALO’s findings.  The
factfinder has ultimate discretion in determining issues of credibility and
weighing the evidence to come to a factual conclusion.  Evans Grp.,
2012 VT 77, ¶ 16.

¶ 20.        
Respondent does challenge the ALO’s conclusion that her behavior
in creating a hostile work environment constitutes a violation of the statute
sanctioning unprofessional conduct.  The ALO’s findings support the
conclusion that in this case the environment respondent created is appropriate
for a finding of professional misconduct.  Some of the conduct identified
by the ALO that did or could have affected patient care includes “going off” on
staff in public areas and yelling at a staff member in a resident’s area.
 The ALO’s findings on this subject—which are supported by the
evidence—paint a picture of abusive conduct toward staff members that was
sufficiently frequent and public that the ALO had a sufficient basis to
conclude that respondent’s treatment of staff members impacted patient
well-being.  Mistreatment of staff, patients or visitors can constitute
grounds for discipline if it rises to the level that it threatens the health,
safety and welfare of patients.

¶ 21.        
The fourth category of incidents found by the ALO to constitute
unprofessional conduct pursuant to 3 V.S.A. § 129a(b)(1)-(2) involves
respondent interrupting “medication passes.”  One of the functions of
nurses within a nursing home is the delivery, or “passing,” of
medications.  A “medication pass” involves delivery of the appropriate
medications to each patient who is due for medications at a particular interval;
the ALO explained that because the medications for each resident vary and
because there may be numerous and diverse medications for each resident, the
delivery of the medications can be a time-consuming process, and must be
undertaken carefully and within certain timing parameters.  The ALO
identified multiple instances in which respondent interrupted nurses’
medication passes, causing delay.  The record amply supports these
findings.

¶ 22.        
Again, respondent does not directly challenge these findings, but rather
offers countervailing evidence.  Her primary challenge is that the
interruptions were infrequent, brief, and nondetrimental to patient care. 
The State offered competent expert testimony to the contrary sufficient to
support the ALO’s conclusion that the medication pass interruptions constituted
unprofessional conduct, especially given the repeated complaints.[3]

¶ 23.        
Finally, the ALO found that the Division of Licensing and Protection had
identified a number of deficiencies with the nursing home in the context of a
regular review.  The ALO based a determination that respondent had engaged
in unprofessional conduct on these institutional deficiencies.  Although
the ALO considered respondent’s response to two of the cited deficiencies—one
involving a revised recreation plan and another involving a medication
overdose—it did not specifically find that respondent was responsible for their
occurrence, but instead held her liable on the basis that administrators are
charged with general administration of the home and are thus responsible for
all that occurs there.  In so concluding, the ALO relied on In re
Carleton, No. NH 02-1006 (Sept. 24, 2009),
http://www.vtprofessionals.org/opr1/oprdocs/all/NH02-1006.pdf, an
administrative decision by the Secretary of State.  The State argued as
much to the ALO:  “[T]his hearing authority has already decided—and I’m
using the word ‘per se,’ but that—that a survey with adverse outcomes is
essentially per se failing to abide by the essential standards and practice of
the profession.”

¶ 24.        
Respondent does not contest that the survey occurred and that
deficiencies were found.  She does, however, argue that these deficiencies
cannot be grounds for a violation.  We disagree that deficiencies can
never be grounds for discipline, but agree with respondent that, in this
instance, she cannot be subjected to professional discipline and penalties on
account of the deficiencies here.  The ALO could possibly have relied on
specific actions by respondent in responding to the deficiencies, but
purported to go further by resting the disciplinary consequences for the
deficiencies on respondent’s general responsibility for the goings-on at the
facility.  The ALO could assuredly prescribe disciplinary sanctions for
deficiencies to the extent they are tied to an administrator’s actions or
omissions—direct or supervisory—but it cannot presume a violation of
professional standards merely from the fact that a deficiency exists.  See
In re Jon Porter, 2012 VT 97, ¶ 16, __ Vt. __, 70 A.3d 915 (holding
that finding of medical doctor’s professional misconduct based on physician
assistant’s actions was improper where conduct not linked to doctor’s actions
or inadequate supervision).  Like the statute regulating the doctor’s
conduct in Porter, the statute regulating respondent’s conduct sets out
a detailed list of fifteen bases for finding “unprofessional conduct” on the
part of a nursing home administrator.  None of these bases includes a
Division of Licensing and Protection finding of deficiency, a process closely
bound with nursing home administration and therefore easily includable if the
Legislature so intended.  3 V.S.A. § 129a.  Moreover, the ALO
did not make any findings to suggest that the specific deficiencies identified
in the survey and upon which the ALO relied reflected a violation of a
professional obligation by respondent.  Although the NHA has overall
responsibility for the facility, and respondent has professional obligations in
discharging her oversight responsibilities, she is not automatically liable in
disciplinary proceedings for deficiencies in the facility without more. 
For this reason, on the record before us, we conclude that the deficiencies
cited by the ALO cannot stand as a basis for a determination of respondent’s
unprofessional conduct.[4] 


II.

¶ 25.        
We turn now to the five-year license-suspension sanction that the ALO
imposed.  With respect to sanctions, an “ALO has discretion to impose an
appropriate sanction if there is a showing of unprofessional conduct.”  Devers-Scott,
2007 VT 4, ¶ 10 (quotation omitted).  Although an ALO’s sanction
determination is reviewed for abuse of discretion, “[w]e will examine a
nonexpert ALO’s sanction determination more closely than we would the same
determination by an expert board.”  Id.  The ALO in this case
is not an expert board; thus, we review the ALO’s discretionary determinations
with a higher degree of scrutiny.

¶ 26.        
Because we have stricken two of the findings of unprofessional conduct
upon which the ALO’s sanction was based—the determinations predicated on
respondent’s questioning a physician’s withdrawal of life-sustaining treatment
and on identified institutional deficiencies—remand for redetermination of
respondent’s sanction is appropriate in any event.  We address the
proportionality of the sanction here for consideration by the ALO on remand.

¶ 27.        
In this case, OPR requested a one-year license suspension, yet the ALO
elected to suspend respondent’s license for five years.  Although the ALO
cites respondent’s failure to accept responsibility as the reason for the
longer suspension (we agree with the ALO’s emphasis on this consideration where
here a fundamental change is needed in respondent’s temperament and approach to
her management responsibilities), OPR’s sanction request had the information to
take this into account.  Although the hearing officer is not necessarily
bound by the parties’ requests, and may exercise reasonable discretion to
impose a sanction outside of the boundaries defined by the parties’ respective
requests, a full-blown suspension five times as long as that requested by the
State raises red flags.

¶ 28.        
Moreover, of the other cases involving nursing home administrators who
have faced disciplinary proceedings in Vermont, the sanction in this case
appears to be an outlier.[5] 
As a practical matter, a five year license suspension is tantamount to a
revocation, as it essentially forces respondent to change careers—at least
temporarily.  We reiterate our concern that the professional disciplinary
process not be used as a means for punishing people with bad interpersonal or
managerial skills but, rather, be limited in its scope to reasonable public
protection.  

¶ 29.        
Thus, we reverse the ALO’s determinations that respondent engaged in
unprofessional conduct by questioning a doctor’s withdrawal of life-sustaining
treatment and on account of the Division of Licensing and Protection survey
deficiencies, affirm the ALO’s other findings of unprofessional conduct, and
remand to the trial court for remand to the ALO for redetermination of the
applicable sanction.  

Affirmed in part, reversed in
part, and remanded for further proceedings consistent with this opinion.

 

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1] 
To the extent that respondent challenges the ALO’s or the superior court’s
findings and conclusions of law as relying on the allegation that she is
psychologically unfit to practice, the ALO explicitly found that there was no
evidence that respondent had been diagnosed with a psychological impairment.





[2]
 Respondent argues that the ALO’s finding on this point was based on the
speculative comments of a witness.  Insofar as the finding was supported
by the testimony of other witnesses, including respondent herself, and given
that the ALO did not predicate a specific unprofessional conduct determination
on this finding, we find no error in the ALO’s conclusion.

 

Respondent also argues that the evidence does not
support the ALO’s conclusion that respondent improperly interceded in a
resident’s skin treatment.  However, respondent does not point us to a
particular finding in the ALO’s order, and we cannot locate any such
finding.  Because it appears that the ALO did not make such a finding, and
did not base an unprofessional conduct determination on such a finding, we do
not address respondent’s arguments. 





[3] 
We recognize respondent’s hearsay objection—that the testimony of some
witnesses on this point was based, at least in part, on complaints from
others.  However, the first-hand accounts from nurses who were personally
interrupted during medication passes are sufficient to support the ALO’s
findings. 





[4]
 Respondent also argues in her brief that the charges lodged against her
“ignore . . . the Herculean leadership task that [she] has performed
since October 2006 to keep the nursing home open and to make it safe and
solvent.”  The ALO acknowledged the strides respondent made at the home,
and expressly considered respondent’s positive efforts in determining the
appropriate sanction: “But for the strong showing of competence by [respondent]
in some areas of practice and her strong work ethic, license revocation would
be the likely remedy in this case.”

 





[5]
 We acknowledge the limitations of this kind of comparison.  Every
case is different, and the vast majority of the approximately dozen other
nursing home administrators who have faced sanctions have stipulated.  But
we note that most nursing home administrators who have faced
sanctions—including for conduct more directly threatening to patient well-being
than respondent’s—have faced far less punitive sanctions, focusing on license
conditions and monitoring rather than outright suspension for multiple
years.