2012 VT 97

## In re Jon Porter, M.D.

[70 A.3d 915]

No. 12-045

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed November 9, 2012

---

*William H. Sorrell*, Attorney General, and *Kurt A. Kuehl*, Assistant Attorney General, Montpelier, for Petitioner-Appellant.

*S. Crocker Bennett, II* and *David M. Pocius* of *Paul Frank + Collins P.C.*, Burlington, for Respondent-Appellee.

*Angela R. Clark* and *Ritchie E. Berger* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Amicus Curiae Fletcher Allen Health Care.

*O. Whitman Smith* of *Mickenberg, Dunn, Lachs & Smith, PLC*, Burlington, for Amici Curiae Community Health Centers of Burlington, Inc. and Vermont Council of Developmental and Mental Health Services, Inc.

¶ 1. **Reiber, C.J.** This case asks us to determine whether a physician can be held answerable as a matter of professional discipline solely on the basis of a physicians assistant's (PA) unprofessional acts. The Board of Medical Practice concluded that it was not required to find Dr. Jon Porter guilty of unprofessional conduct based solely on the acts of a PA whom he supervised. We affirm.

¶ 2. Dr. Porter, director of the University of Vermont Center for Health and Wellbeing, was a supervising physician for a PA from 1996 through 2009. Sometime in 2009, nursing students conducted a study of drug diversion at UVM, wherein a student interviewee commented that the PA was a source of controlled substances. Dr. Porter learned of the comment and began investigating the PA using electronic medical records. He discovered that the PA was an outlier in prescribing opiates and other controlled substances, and concluded that the PA had engaged in improper prescribing practice. Dr. Porter filed a complaint with the Board.

¶ 3. In August 2009, the Board began investigating the PA. The PA admitted to improperly prescribing opiate medications, and stipulated that his actions constituted professional negligence and unprofessional conduct. The Board approved the stipulation and consent and disciplined the PA.

¶ 4. In December 2010, the State filed a specification of charges against Dr. Porter. Of central relevance to the present case, the State alleged in count I that under 26 V.S.A. § 1739 Dr. Porter was "legally liable [as a matter of professional discipline] for the inappropriate and non-compliant prescribing activities of [the PA], who acted as Respondent's agent." Attributing the PA's actions to

the doctor, the State alleged that the doctor had vicariously engaged in unprofessional conduct, and was therefore subject to disciplinary action. The specification included four other counts related generally to the doctor's supervision of the PA. Count II alleged that Dr. Porter's supervision of the PA failed to conform to essential standards of acceptable and prevailing practice and constituted unprofessional conduct; count III alleged that Dr. Porter failed to adequately monitor the PA's practice under Board Rule 5.1 and that Dr. Porter was "liable for the actions of [the PA] by law"; count IV alleged that Dr. Porter failed to craft policy to provide meaningful review of the PA's practice under Board Rule 7.1(c); and count V alleged that Dr. Porter failed to regularly conduct retrospective review of the PA's charts under Board Rule 7.5. Dr. Porter moved to dismiss counts I and III, arguing that § 1739 makes a supervising physician "legally liable" to an injured third person for the tortious conduct of his or her PA, but does not contemplate holding a supervising physician vicariously guilty in professional disciplinary proceedings of unprofessional acts committed by a PA on a theory of "strict liability." The Board denied the motion.

¶ 5. A three-person committee held a hearing in September 2011 and issued a proposed decision and order in December 2011. It recommended that the Board find that Dr. Porter committed unprofessional conduct as alleged in count I but recommended not sanctioning Dr. Porter. The committee reasoned that the PA's acts were Dr. Porter's acts because 26 V.S.A. § 1739(a) imposes an agent-principal relationship, and thus Dr. Porter was guilty, once the guilt of the PA was established, of unprofessional conduct. The committee found that the PA's prescription of controlled substances constituted a "failure to conform to the essential standards of acceptable and prevailing practice," in violation of 26 V.S.A. § 1354(b)(2), and that, "[s]ince the acts of the agent . . . are the acts of his principal," Dr. Porter was therefore guilty of violating § 1354.[1] The committee recommended dismissing counts II, IV, and V because Dr. Porter properly supervised the PA and met or exceeded applicable standards of acceptable and prevailing

---

[1] Section 1354(b)(2) provides: "The board may also find that failure to practice competently by reason of any cause on a single occasion or on multiple occasions constitutes unprofessional conduct. Failure to practice competently includes, as determined by the board: . . . (2) failure to conform to the essential standards of acceptable and prevailing practice."

practice. The committee also recommended dismissing count III because it had already recommended finding Dr. Porter "legally liable" for the same conduct in count I. Both parties filed objections to the committee's proposed decision.

¶ 6. The Board held a hearing in January 2012 to determine whether to accept, modify, or reject the committee's proposed decision and order. The Board rejected the committee's recommendation regarding count I, stating that it "is not required by law to find that Dr. Porter is guilty of unprofessional conduct for improperly prescribing 'schedule drugs' based solely on the fact that the PA [], who Dr. Porter was supervising, engaged in this conduct." It reasoned that where Dr. Porter did not engage in the conduct, was not aware of it, and could not reasonably be expected to be aware of it, the law does not require him to be found guilty of unprofessional conduct for the acts of the PA. The Board adopted the committee's findings and conclusions as to counts II through V, and dismissed all of the charges.

¶ 7. On appeal, the parties disagree about the appropriate standard of review. The State argues for de novo review, framing the appeal as the purely legal question of whether 26 V.S.A. § 1739(a) imputes to supervising physicians a PA's unprofessional conduct for purposes of professional discipline on a theory of strict vicarious liability. Dr. Porter, meanwhile, argues that we should review the Board's conclusion that he did not violate § 1354(b)(2) for abuse of discretion and, further, that we must accord deference to the Board's interpretation of § 1739 as the agency charged with the statute's execution.

■ ■ ¶ 8. We defer to an administrative agency's interpretation "of statutory provisions that are within its particular area of expertise." *In re Prof'l Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996). Where the Board evaluating the professional's conduct is composed of "a group of his peers," we afford the Board's decision additional deference. *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997). "Our standard of review is based, however, on the nature of the Board's expertise and the appropriateness of paying deference to it." *In re Vt. Power Exch.*, 159 Vt. 168, 179, 617 A.2d 418, 424 (1992). The Board, composed of nine licensed physicians, one physician assistant, one podiatrist, and six persons not associated with the medical field, 26 V.S.A. § 1351(a), is "broadly empowered to

investigate and adjudicate charges of unprofessional conduct by licensees, to issue licenses, and to suspend, revoke, or refuse to issue licenses based upon a finding of unprofessional conduct," *In re Chase*, 2009 VT 94, ¶ 6, 186 Vt. 355, 987 A.2d 924 (quotation omitted). The Board, "as an administrative body, has only such powers as are expressly conferred upon it by the Legislature, together with such incidental powers expressly granted or necessarily implied as are necessary to the full exercise of those granted." *Perry v. Med. Practice Bd.*, 169 Vt. 399, 403, 737 A.2d 900, 903 (1999) (quotation omitted).

■ ■ ¶ 9. The determination of the meaning of "legally liable" and the legal bounds of the agent-principal relationship of a physician and his or her PA under 26 V.S.A. § 1739, however, falls outside of the Board's expertise and the scope of its statutorily proscribed powers. Thus, we give no deference to the Board's determination of whether Dr. Porter is answerable as a matter of professional discipline for his PA's unprofessional acts under § 1739. Cf. *In re Cent. Vt. Pub. Serv. Corp.*, 172 Vt. 14, 19-20, 769 A.2d 668, 673 (2001) ("The applicability of judicially-created doctrines such as claim preclusion or issue preclusion in rate cases is not an issue within the Board's expertise of utility law. . . . Thus, we give no deference to the Board's decisions on claim preclusion and issue preclusion."). We do, however, defer to the Board's assessment of Dr. Porter's professional conduct under § 1354. See *In re Chase*, 2009 VT 94, ¶ 6 ("[W]e defer to determinations that require the Board to apply its expertise or weigh whether certain behavior violated the standard of care pertaining to unprofessional conduct under the statute over which it has authority.").

■ ¶ 10. Section 1739(a) provides that "[t]he supervising physician delegating activities to a physician assistant shall be legally liable for such activities of the physician assistant, and the physician assistant shall in this relationship be the physician's agent." Our principal goal when interpreting a statute "is to effectuate the intent of the Legislature." *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999). We first look to the plain language of the statute. *Id.* If the meaning is clear, we enforce the statute according to its terms without resort to statutory construction. *Id.* Only if the language is unclear and ambiguous do we resort to legislative history to determine the Legislature's intent. *In re Margaret Susan P.*, 169 Vt. 252, 262, 733 A.2d 38, 46 (1999).

¶ 11. The plain meaning of the phrase "legally liable" does not encompass responsibility for violations of professional obligations. Black's Law Dictionary defines legal "liability" as "[t]he quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment." Black's Law Dictionary 997 (9th ed. 2009). To illustrate, Black's uses the example of "liability for injuries caused by negligence." *Id.* Being legally obligated or accountable denotes some obligation that is grounded in law, such as a statutory, common-law, or regulatory provision that enforces another party's rights or imposes a legal penalty. That concept is distinct from being accountable from the standpoint of professional discipline under the laws enacted by the Legislature. Such obligations derive from standards and rules that govern a specific profession and provide a structure for regulating conduct within that profession. The remedy for a violation of a professional obligation is disciplinary in nature; it is not the imposition of a "civil remedy or criminal punishment." *Id.* Tellingly, the State conceded at oral argument that it could not find any setting in which a disciplinary action was described as imposition of liability. Thus, in the context of professional oversight it is inaccurate to say that one may be "legally liable" for a violation of a professional obligation because the two mechanisms are procedurally and substantively different.

¶ 12. An exploration of the words "legally liable" in context fairly negates the State's reading because our statutes implicitly distinguish between legal liability, typically at issue in a civil action or for a monetary penalty, and unprofessional conduct at issue in a professional licensing disciplinary proceeding. In Title 26, the Legislature uses "liability," "legal liability," and "legally liable" to refer to: the legal responsibility of a licensed supervising professional for "all negligent or wrongful acts or omissions" of a temporary licensee, 26 V.S.A. §§ 378, 1391, responsibility for damages in a civil action, *id.* §§ 1317, 1355, 1582, 2404, responsibility in malpractice cases, *id.* § 1368, responsibility to pay a fine or penalty, *id.* §§ 1742, 2864, "monetary liability," *id.* § 2404, and "tort liability," *id.* § 2405. When the Legislature refers to responsibility for unprofessional conduct, however, it uses the word "guilty." See *id.* §§ 78, 376, 1361, 1659, 1719, 1737, 2121, 2431, 2859, 3016a. In other words, one is generally "liable" in the civil context for damages or for a monetary penalty, while one is

"guilty" of engaging in unprofessional conduct. Thus, while the doctor may have legal liability for his agents' acts of professional negligence, the State's argument that one may be "legally liable" for his or her agents' unprofessional conduct is unavailing. The language consistently used by the Legislature does not square with such an interpretation.

■ ■ ¶ 13. Indeed, in the same title, the Legislature has distinguished between legal liability and professional responsibility. In § 2086(a) of Title 26, the Legislature has provided that a physical therapist is "professionally responsible and legally liable for all aspects of the physical therapy care of each of his or her patients." Because we presume that the Legislature chooses its words advisedly, *Robes v. Town of Hartford*, 161 Vt. 187, 193, 636 A.2d 342, 347 (1993), we conclude that the Legislature knowingly distinguished between the principles of legal liability and professional responsibility because the two concepts are discrete. One is used in the context of liability, while the other is used in the context of professional disciplinary schemes. That the Legislature used the phrase "legally liable" in § 1739, and chose not to use the phrase "professionally responsible" in addition to or instead of "legally liable" suggests that § 1739 encompasses only the concept of civil liability, and does not render a supervising physician vicariously answerable or guilty for the unprofessional acts of his or her PA simply on the basis of their relationship. Consequently, the State's interpretation of "legally liable" stretches those words beyond their plain meaning, and is therefore unsustainable.

■ ¶ 14. That the statute also provides that the PA is the supervising physician's agent is of no moment. In general, agency theory applies in tort or contract cases, not professional responsibility actions. See, e.g., *Douglas v. O'Connell*, 139 Vt. 427, 429, 429 A.2d 1310, 1311 (1981) (contract liability); *Greenough v. U.S. Life Ins. Co. of City of N.Y.*, 96 Vt. 47, 51, 117 A. 332, 334 (1922) (tort liability); see generally Restatement (Third) of Agency §§ 6.01-6.03 (2006) (describing when principal and agent are parties to contract entered into by agent); Restatement (Third) of Agency § 7.03 (describing when principal may be held liable in tort for agent's actions). It would thus be anomalous to conclude that a supervising physician may be held professionally responsible for the unprofessional acts committed by a PA under an agency theory. To the contrary, it makes sense that, in designating

the PA the agent of the supervising physician, the Legislature sought to affirm the path for a tort plaintiff to recover from the supervising physician where the PA has committed a tortious act.

¶ 15. The State's contention that *In re Desautels Real Estate, Inc.*, 142 Vt. 326, 457 A.2d 1361 (1982), supports its interpretation of § 1739 is similarly unavailing. In *Desautels*, the Vermont Real Estate Commission found the principal broker for a real estate corporation "vicariously liable" for the bad faith and untrustworthy conduct of two salespeople, and suspended his license. *Id.* at 332, 457 A.2d at 1363. Because the salespeople could be licensed only when employed by a licensed broker, and the license terminated when the employment relationship ceased, the Court concluded that the doctrine of vicarious liability applied to the relationship between the broker and the salespeople. *Id.* at 337, 457 A.2d at 1366 (citing 26 V.S.A. §§ 2211, 2292(b)). Contrary to the State's assertion, the real estate and medical licensing regimes are too dissimilar to draw any appropriate parallels. In *Desautels*, the real estate corporation could not have had a corporate license without designating an individual to serve as a broker under the license. *Id.* at 336, 457 A.2d at 1366 (interpreting a subsequently amended version of 26 V.S.A. § 2291). There, only that named licensee — the principal broker — could make offers, sell real estate, or negotiate a sale, under the provisions of the then applicable statutory language. See *id.* Thus, the salespeople were acting under the principal broker's license, and the principal broker was the "alter ego" of the real estate corporation. *Id.* at 337, 457 A.2d at 1366. Here, where the relationships are more closely defined by statute, there is no such relationship. There the professional regulatory structure was dim; here it is robust. Nor did *Desautels* involve interpretation of anything akin to § 1739. The *Desautels* Court was not determining whether a principal broker could be "legally liable" for the acts of the salespersons, unlike in this case in which we are interpreting a statute that makes a supervising physician "legally liable" for the acts of a PA.

¶ 16. Having concluded that § 1739 does not subject a supervising physician to discipline solely for a PA's unprofessional acts on a theory of strict vicarious liability, we must also analyze whether such responsibility may be premised on § 1354. The Board concluded that "it *is not required by law* to find that Dr. Porter is guilty of unprofessional conduct for improperly prescribing 'schedule drugs' based solely on the fact [that the PA], who[m]

Dr. Porter was supervising, engaged in this conduct," and dismissed the charges. While we agree with this result, we conclude that it would not, in fact, have been within the Board's authority to discipline Dr. Porter under § 1354 based solely upon the PA's unprofessional acts. The Board has only those powers expressly conferred upon it by the Legislature, in addition to those incidental powers necessary to exercise those granted. *Perry*, 169 Vt. at 403, 737 A.2d at 903. Section 1354 — titled "[u]nprofessional conduct" — sets out a detailed list of thirty-nine bases under which a physician may be held professionally responsible. The list does not include misconduct of a PA, but focuses instead on a physician's acts, namely actions that bear on a physician's fitness and ability to practice in the state. The regulatory scheme does, however, provide standards to ensure adequate supervision and discipline for doctors who fall short. See, e.g., 26 V.S.A. § 1354(b)(2). Here, the Board found that Dr. Porter did not fail to follow the progress of the PA's patients, that his process for review exceeded that specified in the scope of practice approved by the Board, and that his review of PA-generated charts met the requisite standard of care. Any finding of unprofessional conduct in this case would necessarily have been based upon the PA's conduct alone because the Board found that Dr. Porter did not fail to meet the standards of care, and in one case exceeded that required by the Board. Because § 1354 does not include a basis for disciplining a physician based solely upon the acts of a PA, the Board quite simply would not have had the authority to sanction Dr. Porter for the PA's acts under that statute.

¶ 17. In sum, § 1739 does not make supervising physicians answerable as a matter of professional discipline solely for the unprofessional acts of PAs they supervise because the statute does not pertain to professional responsibility. Furthermore, § 1354 provides no basis for disciplining a supervising physician whose PA has committed an unprofessional act where the supervising physician has met or exceeded all standards of care.[2]

*Affirmed.*

---

[2] Because we have rejected the State's arguments regarding § 1739, we do not reach Dr. Porter's argument that the State's interpretation violates Dr. Porter's due process rights.