NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 35

No. 23-AP-074

In re Grievance of Michael Miller  
(State of Vermont, Appellant)

Supreme Court

On Appeal from  
Labor Relations Board

September Term, 2023

Richard W. Park, Chair

Charity R. Clark, Attorney General, and Patrick T. Gaudet[1], Assistant Attorney General, Montpelier, for Appellant.

Timothy Belcher, Vermont State Employees' Association, Montpelier, and Patrick N. Bryant of Pyle Rome Ehrenberg PC, Boston, Massachusetts, for Appellee.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1.     **EATON, J.**   The Vermont Labor Relations Board reversed the State's termination of grievant, Chittenden Regional Correctional Facility (CRCF) employee Michael Miller, finding that the State failed to prove allegations of racial discrimination and racial harassment. The State appeals, claiming that the Board misinterpreted the meaning of racial discrimination and racial harassment in the applicable personnel policies. We affirm.

¶ 2.     The Board found the following. Grievant, who is white, worked as a Correctional Security Operations Supervisor at CRCF. Grievant recruited coworker, who is Black, when

_____

[1] Rachel E. Smith, Deputy Solicitor General, was on the appellant's brief. Patrick T. Gaudet substituted as counsel and was on the appellant's reply brief.

coworker was a student, and later supervised coworker once he was employed at CRCF. Coworker described his professional relationship with grievant as "cordial."

¶ 3.     Grievant was a permanent employee subject to a Collective Bargaining Agreement (CBA) between the State and the Vermont State Employees' Association (VSEA). The CBA incorporates several statewide and Department of Corrections (DOC)-specific policies on discrimination and harassment, including Personnel Policy 3.3, Personnel Policy 5.6, and DOC Work Rule 6. Policy 3.3, entitled Discrimination Complaints, dictates that "[t]he State of Vermont is . . . contractually and legally bound to prohibit unlawful discrimination in the workplace on the basis of race" and requires that all employees "take appropriate measures to ensure that discrimination does not occur." Under this policy, discrimination "include[s] all forms of mistreatment or denial of privileges based upon impermissible factors as established by state or federal law, applicable regulations, or applicable [CBA]s." Policy 5.6, pertaining to employee conduct, requires that "[e]mployees shall not discriminate against, intimidate, nor harass any employee because of race, color . . . or any other factor for which discrimination is prohibited by law." Work Rule 6 prohibits employees from engaging in "verbal or physical behavior towards employees . . . which is malicious, demeaning, harassing or insulting." Under this rule, harassing behavior includes "indecent or vulgar language or gestures, [and] actions or inactions which are rude."

¶ 4.     On December 31, 2020, an incident occurred resulting in alleged violations of these policies and giving rise to this appeal. Coworker was using the microwave in a CRCF employee breakroom to reheat food and left to retrieve a fork. Grievant then entered the breakroom and asked who was heating up chicken in the microwave. When coworker returned, grievant asked whether the food in the microwave was coworker's and whether it was fried chicken. Coworker responded that it was his food but that it was seafood with vegetables, not fried chicken. According to other employees who witnessed this incident, grievant repeated that the food smelled like fried chicken. Coworker ignored him. This entire exchange lasted approximately thirty seconds.

2

¶ 5.     Coworker later wrote to the CRCF Superintendent and his union representative about this incident.  He stated that he found grievant's questioning about whether the food was fried chicken "very racist," especially coming from a supervisor.  In response to these serious allegations of racist conduct, CRCF placed grievant on leave and notified him that he was under investigation because he "engaged in misconduct" by "harassing a co-worker using a racial stereotype."[2]  CRCF engaged in a full investigation.  During his initial interviews with CRCF, grievant did not recall how many times he asked about whether the food was fried chicken.  Grievant asserted that his question was solely about the food and was not intended as a racial comment.  The State then sent grievant a Loudermill letter alleging that grievant committed gross misconduct by making racially harassing comments toward a subordinate and failing to be truthful during the investigation.[3]  Following a Loudermill hearing, the State found that grievant engaged in discriminatory and unprofessional behavior towards coworker, and that certain statements he made in the investigation were untruthful.  In all, the State concluded that he violated nine provisions of the personnel policies and work rules.  Based on grievant's alleged violations, the State dismissed him.

¶ 6.     Grievant, through the VSEA, filed a grievance with the Board, arguing that he was dismissed without just cause.  The Board conducted a hearing and issued a written order.  In its order, the Board outlined the text of Policy 3.3, prohibiting unlawful discrimination on the basis

---

[2]  The stereotype associating fried chicken with Black Americans has persisted for well over a century.  See R. Graham, Fried Chicken, Watermelon, and the Origins of Racist Food Stereotypes, Bos. Globe (Feb. 13, 2022), https://www.bostonglobe.com/2022/02/13/opinion/fried-chicken-watermelon-origins-racist-food-stereotypes/.  Although the Board found that grievant lacked racist intentions, we do not doubt the negative impact of grievant's words.

[3]  A "Loudermill letter" provides a public employee with notice of misconduct accusations against him.  In re Hurlburt, 2003 VT 2, ¶ 29, 175 Vt. 40, 820 A.2d 186.  A "Loudermill hearing" then provides the employee with an opportunity, before the government terminates that employee, to respond to those accusations.  In re Towle, 164 Vt. 145, 153, 665 A.2d 55, 61 (1995).  They are so named for the United States Supreme Court case that first required them as part of a public employee's due process rights.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985).

of race, and Policy 5.6, prohibiting harassment because of race. It noted, however, that these policies "d[id] not further define . . . the types of . . . conduct that is prohibited as harassment or discrimination." The Board thus found it necessary to consult other sources of law defining these terms, including case law interpreting the Vermont Fair Employment Practices Act (FEPA) and Title VII of the Civil Rights Act of 1964.

¶ 7. To establish a claim of race discrimination under FEPA and Title VII, an employee must show that the employee was a member of a protected class, the employee was qualified for the position, there was an adverse employment action, and "the circumstances surrounding this adverse employment action permit an inference of discrimination." Robertson v. Mylan Lab'ys, Inc., 2004 VT 15, ¶ 25, 176 Vt. 356, 848 A.2d 310. The Board did not fully adopt this definition, and instead focused on whether the alleged conduct resulted in an adverse employment action, such that the conduct materially altered the employee's conditions, compensation, privileges, or terms of employment. Employing this definition, the Board concluded that, although coworker was a member of a protected class, there was no evidence of racial discrimination because grievant's fried chicken comment did not alter the material conditions of coworker's employment.

¶ 8. As to racial harassment, the Board looked to definitions found in hostile work environment cases under Title VII, as well as its own cases involving sexual harassment. Based on these sources, the Board determined that racial harassment exists where there is severe or pervasive conduct that alters the conditions of employment and creates a hostile work environment. See In re Boyde, 165 Vt. 624, 626, 687 A.2d 1258, 1261 (1996). Because grievant's one-time statement regarding fried chicken was not "sufficiently severe or pervasive," the Board concluded that it was not racial harassment.

¶ 9. The Board also found no evidence that grievant acted "based on or because of" coworker's race, crediting grievant's explanation that he was just questioning what the food was and not thinking of coworker's race. As such, it found that grievant's actions did not violate Policy 3.3's prohibition on racial discrimination or Policy 5.6's prohibition on racial harassment. It did,

4

however, conclude that grievant's questioning was generally harassing. Thus, it found that grievant's conduct, even if unmoored from any racial animus, violated Work Rule 6's prohibition on "harassing" behavior based on the dictionary definition of the term "harass," and that grievant failed to fulfill his duties as a supervisor and pursue the common good, in violation of Policy 5.6. The Board further found that the State did not prove that during the investigation grievant lied about the number of times he asked coworker whether it was fried chicken and was untruthful when he said that the statements were not motivated by race. Of the nine alleged policy violations the State relied on when it terminated grievant, the Board upheld three, finding grievant engaged in demeaning or harassing behavior, failed to fulfill his responsibilities as supervisor, and exposed the DOC to public embarrassment.

¶ 10.    The Board then turned to the "Colleran factors," see In re Colleran, 6 V.L.R.B. 235, 268-69 (Oct. 27, 1983), to determine whether termination was warranted for the violations proven by the State. One of the Colleran factors is the seriousness of the offense, and the Board noted that the State had failed to prove the most serious allegations: racial discrimination, racial harassment, and untruthfulness during the investigation. The Board acknowledged that grievant did not uphold his duties as a supervisor, failed to act in a professional manner, and demeaned or harassed coworker, and the Board found that this conduct was inappropriate, wrong, and insensitive. However, it also emphasized that grievant expressed a desire to remedy the situation, that no other employees had been terminated on similar grounds, and that grievant held an otherwise unblemished record at CRCF during his twenty-three years of employment. The Board, therefore, concluded that termination was not justified for this "isolated incident" and reduced grievant's penalty to a twenty-day suspension. This appeal by the State followed.

¶ 11.    Under the CBA, the State must have "just cause" to dismiss an employee, such that the employee's conduct was severe enough to warrant dismissal and the employee had fair notice that the conduct could result in dismissal. In re Jewett, 2009 VT 67, ¶ 22, 186 Vt. 160, 978 A.2d 470. The Board then determines "whether the State met its burden of demonstrating . . . just

cause," which the Board found had not been shown based on its interpretation of the policies. Id.

¶ 23. On appeal, the State argues only that the Board applied the incorrect legal standard to whether grievant's actions amounted to racial discrimination and racial harassment. The State makes no claim that the Board's findings of fact were clearly erroneous. Specifically, the State asserts that the Board acted outside of its discretion by analogizing the terms of the policies to definitions found in cases under Title VII, claiming this analogy is at odds with the policies' text and "eviscerates" the policies' goal of preventing workplace discrimination. The State also claims that the Board erred in interpreting the meaning of "harassment" based on race under Policy 5.6 differently than "harassment" as a general matter under Work Rule 6.

¶ 12. We apply a deferential standard when reviewing the Board's interpretation of a CBA because interpreting a CBA's terms is an area within the Board's special expertise. In re VSEA, 2014 VT 56, ¶ 21, 196 Vt. 557, 99 A.3d 1025; Jewett, 2009 VT 67, ¶ 25. As such, it is well settled, despite the dissent's assertions to the contrary, post, ¶ 28, that this Court must "accord substantial deference to the Board's construction" of a CBA. VSEA, 2014 VT 56, ¶¶ 21-22 (emphasis added) (quotation omitted); cf. In re Gorruso, 150 Vt. 139, 143, 549 A.2d 631f, 634 (1988) (denying deference where Board's interpretation of CBA was not reasonably supported).[4] This high degree of deference we give to the Board makes sense. In cases such as this, in which the Board must make difficult decisions on the interpretation of contract terms that have serious consequences for the State and its employees and must draw the proper line between permitted

---

[4] The State relies on In re Harrison and In re Muzzy to support a less deferential standard of review, whereby this Court will reverse the Board when it "fail[s] to apply the appropriate standards to the issues properly before it." 141 Vt. 215, 219, 446 A.2d 366, 367 (1982); see also 141 Vt. 463, 463, 449 A.2d 970, 971 (1982) (reversing Board's order because it "relie[d] on two novel principles of uncertain origin" that are "legally erroneous"). These cases, however, relate to the Board's overall function in just-cause cases, not the level of deference owed to the Board's interpretations of a CBA on appeal. See Harrison, 141 Vt. at 219, 446 A.2d at 367; Muzzy, 141 Vt. at 468, 449 A.2d at 972. The State's emphasis on these decisions is, therefore, misplaced. Grievant, conversely, invites us to provide even more deference to the Board. Our case law clearly establishes the applicable standard, and we decline to reconsider it.

and sanctionable conduct, we justifiably defer to the Board's expertise. See In re Welch, 2020 VT 72, ¶ 3, 213 Vt. 92, 239 A.3d 235 ("[T]he Board's interpretation of the terms of a collective bargaining agreement [is] a matter at the heart of the Board's special expertise . . . [and] we therefore review the Board's . . . conclusions with substantial deference." (citation omitted)); see also In re Porter, 2012 VT 97, ¶ 9, 192 Vt. 601, 70 A.3d 915 (noting that employment boards often deal with difficult cases that "require the Board to apply its expertise" and "weigh whether certain behavior . . . [is] unprofessional conduct" (quotation omitted)).[5]

¶ 13.    A CBA is construed pursuant to traditional principles of contract law. In re Kelley, 2018 VT 94, ¶ 14, 208 Vt. 303, 198 A.3d 44; see Serv Emps. Int'l Union, Loc. 99 v. Options—A Child Care & Hum. Servs. Agency, 133 Cal. Rptr. 3d 73, 80 n.6 (Ct. App. 2011) (indicating that statutes, regulations, policies, and other rules incorporated by reference into contract are interpreted as contract terms). According to these principles, contract terms are interpreted by first looking at their plain language, keeping in mind the context of the agreement as a whole. In re West, 165 Vt. 445, 450, 685 A.2d 1099, 1103 (1996). If the plain language is clear, the terms are enforced as written. Welch, 2020 VT 72, ¶ 11. But if the plain language is ambiguous, such that reasonable people could differ as to its meaning, extrinsic sources of interpretation may be employed. See VSEA, 2014 VT 56, ¶ 24; Nzomo v. Vt. State Colls., 136 Vt. 97, 101, 385 A.2d 1099, 1102 (1978) (affirming principle of contract law that extrinsic evidence of custom or usage is admissible to interpret contractual terms).

---

[5]    The dissent also argues that this Court should not give deference to the Board's interpretation of a CBA because it is inconsistent with the way some courts have addressed this issue. Post, ¶ 31. This argument effectively seeks to overturn our decisions in VSEA and Jewett and walk back the established level of deference our case law requires us to afford the Board's interpretation of a CBA. Neither party expressly asked us to do so, either in their briefing or at oral argument. Without the benefit of their advocacy, we decline to disturb this established case law. See Est. of Girard v. Laird, 159 Vt. 508, 515, 621 A.2d 1265, 1269 (1993) ("We do not lightly overrule settled law."); see also id. at 513 n.3, 621 A.2d at 1268 n.3 (noting this Court must be especially "careful in overruling past precedents without the benefit of . . . parties' advocacy").

¶ 14.   Relying on analogous statutory provisions is an accepted means of interpreting ambiguous contract terms.  Smith v. State Farm Mut. Auto. Ins. Co., 2017 COA 6, ¶ 23, 399 P.3d 771 ("[C]ourts may consider a statute in construing the legal effect of a contract." (citing 11 R. A. Lord, Williston on Contracts § 30:19 (4th ed. 2002))); see In re Whitney, 168 Vt. 209, 215, 719 A.2d 875, 879 (1998) (relying on analogous federal law under National Labor Relations Act to interpret Vermont State Employee Labor Relations Act because "federal law provides [decisionmakers] with useful guidance in interpreting" state law); Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 25, 209 Vt. 620, 210 A.3d 445 ("[W]e look to [the] interpretation and application of the comparable federal [laws] for guidance in interpreting our own." (quotation omitted)).  The validity of using a given extrinsic source to interpret contract terms, however, depends on whether the language at issue is the same as, or at least sufficiently similar to, the language in the extrinsic source.  See Vt. State Colls. Fac. Fed'n, AFT Loc. 3180, AFL-CIO v. Vt. State Colls., 138 Vt. 451, 454, 418 A.2d 34, 36 (1980) (accepting comparison to federal law as "appropriate" unless state and federal statutes at issue "are more different than they are alike").  Ultimately, the goal in interpreting a CBA and related policies, as with the goal of interpreting any contract, is to effectuate the intent of the parties.  In re Cole, 2008 VT 58, ¶ 19, 184 Vt. 64, 954 A.2d 1307; VSEA, 2014 VT 56, ¶ 23.

¶ 15.   Here, the Board appropriately treated the CBA as a contract and began its analysis with the plain language of the policies at issue.  See West, 165 Vt. at 450, 685 A.2d at 1103.  In relevant part, the Board restated Policy 3.3, that "[t]he State . . . is . . . legally bound to prohibit unlawful discrimination in the workplace on the basis of race," and Policy 5.6, that "[e]mployees shall not intimidate or harass any employee because of race."  The Board then recognized that Policy 3.3 considers discrimination "to include all forms of mistreatment . . . based upon impermissible factors as established by state or federal law, applicable regulations, or applicable collective bargaining agreements."  The Board noted, however, that Policy 3.3 does not further define what specific statements or actions fall within this definition, and as the State concedes,

Policy 5.6 does not define "harassment" at all. As such, plain language alone could not resolve the issue before the Board. See VSEA, 2014 VT 56, ¶ 24; see also Towslee v. Callanan, 2011 VT 106, ¶ 5, 190 Vt. 622, 55 A.3d 240 (mem.) (recognizing plain language is not sufficient if term at issue is ambiguous such that "reasonable people could differ as to its interpretation").

¶ 16.    Absent further clarification in the policies, the Board justifiably looked elsewhere, to analogous definitions under state and federal statutes, for guidance on the meaning of racial discrimination and racial harassment, as was its province to do. See Smith, 2017 COA 6, ¶ 23; see also Whitney, 168 Vt. at 215, 719 A.2d at 879; Agency of Nat. Res., 2019 VT 21, ¶ 25. The Board's decision to rely on case law under FEPA and Title VII is a credible means of interpreting the CBA because, "[a]lthough not controlling, federal decisions . . . under Title VII of the Civil Rights Act of 1964 . . . provide useful analytical guides" for the Board. In re Butler, 166 Vt. 423, 428, 697 A.2d 659, 663 (1997). Indeed, there is a close similarity between the language in the policies and the terms used in Title VII statutes. Cf. Vt. State Colls. Fac. Fed'n, 138 Vt. at 454, 418 A.2d at 36. The personnel policies pertain to "discrimination . . . on the basis of race" and "harass[ment] . . . because of race." The language in FEPA is substantially similar to the language found in these policies: "to harass or discriminate . . . because of race." 21 V.S.A. § 495(a)(1). FEPA, in turn, is nearly identical to the language in Title VII: "to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). FEPA is "patterned on Title VII" and operates based on standards that are "identical to those under Title VII." Payne v. U.S. Airways, Inc., 2009 VT 90, ¶ 10, 186 Vt. 458, 987 A.2d 944; Hodgdon. v. Mt. Mansfield Co., 160 Vt. 150, 161, 624 A.2d 1122, 1128 (1992).

¶ 17.    The dissent takes umbrage with the Board's decision to look elsewhere and not to rely on plain language alone, claiming that the Board "acted unreasonably" in not relying solely on the plain language of the CBA's terms. Post, ¶¶ 25, 30-32. In essence, the dissent disagrees with the Board's methods of contract interpretation and therefore seeks to define the CBA's terms in a manner it would find more appropriate under these circumstances. That is not deference; it is

9

de novo interpretation. It is not our role on appeal to reinterpret the Board's reasonable legal conclusions, such as their reading of a CBA, de novo. VSEA, 2014 VT 56, ¶ 21; Jewett, 2009 VT 67, ¶ 25. We cannot, as the dissent would have us, second-guess the soundness or policy repercussions of the Board's decision to reasonably rely on analogous definitions under Title VII.

¶ 18. To establish a claim of racial discrimination under Title VII, an employee must show, among other things, membership in a protected class. Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 129 (2d Cir. 1996). The employee must also demonstrate that there was an adverse employment action, such that the conduct materially affected the employee's conditions, compensation, privileges, or terms of employment. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Although the Board found that coworker is a member of a protected class, the Board concluded that grievant's actions did not rise to racial discrimination because grievant's actions did not result in "any setback[s]" that materially affected coworker. Comparable federal case law under Title VII supports this determination. For example, in Caldwell v. ServiceMaster Corp., an employee asked a black coworker whether she "brought fried chicken to eat," which the United States District Court for the District of Columbia held was insufficient for an actionable claim under Title VII. 966 F. Supp. 33, 51 (D.D.C. 1997); see Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1081 (8th Cir. 2010) (holding that "[a] comment about fried chicken," although "inappropriate," did not create actionable Title VII claim), overruled in part on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011) (en banc); Hawkins v. Vantage Point Behav. Health, LLC, No. 5:13-CV-5224, 2014 WL 6851473, at *4 (W.D. Ark. Dec. 2, 2014) (holding that comment made by supervisor that Black employees "must love fried chicken," while "offensive and deplorable," "d[id] not rise to the level necessary to create an actionable . . . claim under Title VII").

¶ 19. Racial harassment exists under Title VII when conduct directed at an employee results in a hostile work environment, such that there is "intimidation, ridicule, and insult that is sufficiently severe or pervasive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation

10

omitted).  An isolated incident, however, is typically insufficient to establish a harassment claim unless it is "extraordinarily severe."  Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013).[6]  Based on its unchallenged finding that grievant's "isolated incident" questioning whether coworker's lunch was fried chicken was not "severe or pervasive," the Board reasonably concluded that grievant's actions did not amount to harassment based on race.  Comparable federal case law again supports this determination.  In the highly similar matter of Cooper Tire & Rubber Co. v. National Labor Relations Board, an employee asked "[h]ey anybody smell that? I smell fried chicken" in the presence of a Black coworker.  866 F.3d 885, 889 (8th Cir. 2017).  The Eighth Circuit, however, rejected the coworker's Title VII harassment claim because isolated, "stray remarks," even if inappropriate, "generally are not severe or pervasive enough to change the conditions of employment."  Id. at 892.  Similarly, in Reed v. Procter & Gamble Manufacturing Co., the Sixth Circuit determined that isolated comments about fried chicken said to a Black coworker were not severe or pervasive, and thus could not sustain a Title VII hostile work environment claim.  556 Fed. App'x. 421, 433 (6th Cir. 2014).

¶ 20.  Although this application of "harassment" based on race under Policy 5.6 (via an analogy to cases decided under Title VII) differed from the Board's analysis of "harassment" as a general matter under Work Rule 6 (via a dictionary definition), this distinction is likewise credible and within the Board's discretion.  Looking to dictionary definitions to analyze a word in context is an indisputably valid means of interpreting the legal significance of a word or phrase, see State v. Perrault, 2017 VT 67, ¶ 13, 205 Vt. 235, 173 A.3d 335, but dictionary definitions need not be the definitive or exclusive means of interpretation, see Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945) (stating that law must not "make a fortress out of the dictionary"), aff'd sub nom.,

---

[6] The Board did not, as the State claims, rely on the entire scope of the prima facie standard for a Title VII claim.  For example, the Board made no reference to other Title VII harassment requirements, such that the plaintiff must show that discrimination would detrimentally affect a reasonable person of the same race.  Cf. Cole v. Del. Tech. & Cmty. Coll., 459 F. Supp. 2d 296, 307 (D. Del. 2006) (restating elements of hostile work environment claim).

Markham v. Cabell, 326 U.S. 404 (1945). Racial harassment, moreover, is a specific term of art that differs from harassment as a general matter. See, e.g., Williams v. Aeroflex Wichita, Inc., No. 20-3230, 2023 WL 2395994, at *3 (10th Cir. Mar. 8, 2023) (distinguishing between harassment based on race and other forms of harassment); Brooks v. Frito-Lay, Inc., No. 21-2098-EFM, 2022 WL 2952520, at *11 (D. Kan. July 26, 2022) (same). Thus, it is credible that the Board analyzed these two policies differently because Policy 5.6's prohibition on "harassment . . . because of race" is different from and more limited in scope than Work Rule 6's prohibition on "harassing" behavior in general, as the State concedes. Accord Williams, 2023 WL 2395994, at *3.

¶ 21. The Board's reliance on cases interpreting Title VII also comports with the goal of interpreting the CBA and related policies to effectuate the intent of the parties. The State claims that this analogy is contrary to the intent of the parties because Title VII seeks to provide damages while the policies are meant to prevent harm caused by racially charged conduct from occurring in the first place. This distinction, however, is inconsistent with our prior decisions. Title VII does "seek[] to compensate victims of unlawful employment discrimination," but "its main objective . . . is not to provide redress but to avoid harm." Washington v. Pierce, 2005 VT 125, ¶ 30, 179 Vt. 318, 895 A.2d 173 (quotation omitted). Thus, the personnel policies and Title VII share the same goal. The State created the personnel policies to "achieve work relationships . . . free of . . . discrimination," and Congress similarly enacted Title VII to "afford [employees] the right to work in an environment free from discrimination." Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 242 (W.D.N.Y. 2011) (citing Harris, 510 U.S. at 21). Moreover, Policy 3.3 directly references federal law and states in its definition of discrimination that standards "established by . . . federal law" can aid in interpreting its scope. Consequently, the Board did not, as both the State and the dissent claim, post, ¶ 31-33, insert irrelevant references to Title VII in its decision. Rather, the Board relied on analogous definitions and did not, in so doing, stray from its goal of interpreting the CBA in line with the intent of the parties.

¶ 22. Because the Board did not err in its analogy to cases decided under Title VII, we need not parse the policy implications of the Board's interpretation and consider whether the State's reading or the Board's reading would better prevent racial mistreatment. By asserting that the Board's reading of the policies "eviscerates" their purpose of preventing workplace discrimination, the State wishes us, in effect, to adopt its overall understanding of the CBA and related policies to the exclusion of the Board's. The dissent suggests that a decision to affirm the Board will "preclude the State from intervening" in workplace discrimination, raising the specter that our decision will "potentially signal[] to marginalized persons that some State agents do not really appreciate their struggles and will fail to protect them." Post, ¶¶ 35-36. Our case law compels deference to the Board's reasonable legal conclusions. It is not our role on review to weigh whether the State's proposed reading of the policies—based solely on a broad, plain language understanding of "harassment" and "discrimination"—or the Board's reading—based on an analogy to similar definitions under Title VII—is superior. See Welch, 2020 VT 72, ¶ 3. Rather, we must accept the Board's conclusion here because there is sufficient reasoning to support its interpretation of the policies at issue. See VSEA, 2014 VT 56, ¶ 22.

¶ 23. Although we affirm the Board's interpretation of the policies, we recognize that racial discrimination and harassment in the workplace are serious matters. See Stanback v. DeJoy, No. 3:23-CV-05731-TMC, 2023 WL 7213001, at *1 (W.D. Wash. Nov. 2, 2023); see also Fender v. Smith, No. 12-CV-1364-GMS, 2016 WL 4488184, at *7 (D. Del. Aug. 25, 2016) ("[D]iscrimination and harassment are inherently matters of public concern." (quotation omitted)). The State remains free to amend the language of the policies to more clearly notify employees of what constitutes racial discrimination or harassment, such as by supplying additional or different definitions for these important terms. The State fails to recognize its own role in creating these policies when it attempts to discredit the Board's decision by noting that some policies directly cross-reference federal law, such as 21 U.S.C. § 495(d)(13) in Policy 3.1 on sexual harassment, while others like Policies 3.3 and 5.6 do not. The State and the dissent also wrongly suggest that,

13

under the Board's interpretation, an employer can do nothing to prevent harassment or discrimination until it rises to actionable sanctions. An employer can educate employees, discuss problematic behavior, and give notice of issues it sees. But the absence of any further clarification of what constitutes racial discrimination or racial harassment under this CBA lies with the State, not with the Board. In the absence of further definitional direction, the Board's analytical framework was acceptable.

¶ 24. The Board's interpretation of Policies 3.3 and 5.6 falls within the discretion we afford to its interpretation of a CBA. See Jewett, 2009 VT 67, ¶ 25. As we agree that the Board used an acceptable framework, and in the absence of any challenge by the State to just cause for dismissal on the facts as found, the decision is affirmed. See VSEA, 2014 VT 56, ¶ 21.[7]

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 25. **WAPLES, J., dissenting.** The State and its employees bargained for policies to curtail workplace discrimination and harassment on the basis of race. These policies were ultimately included in the Collective Bargaining Agreement (CBA). The plain language of those policies prohibited the conduct that Grievant engaged in here and the State appropriately took corrective action to ameliorate the negative consequences of the behavior. While I join the majority in recognizing that race-based workplace discrimination and harassment are serious issues, I respectfully disagree with their affirmance of the Board's construction of the contract

---

[7] Because we affirm the Board's reading of the policies, we need not decide whether, as grievant claims, CRCF employees would not have been fairly apprised of the reach of Policy 3.3 and Policy 5.6 had the Board interpreted them differently. Similarly, we need not engage with the State's argument, advanced only in its reply brief, that this Court should disturb the Board's application of the Colleran factors based the State's proposed interpretation.

14

terms at issue here. The Board acted unreasonably in ignoring the plain language and purpose supporting these policies, and instead imported standards from federal law on civil liability for employment discrimination. Allowing the Board's interpretation of these policies to control future state employee behavior will hamper the State from taking corrective action before behavior becomes actionable. The resulting consequences will be to hinder the recent progress this State has made in encouraging a more diverse workforce—one that looks like and shares the experiences of the communities it serves. Because I would reverse the Board's decision, I respectfully dissent.

¶ 26. Although this Court historically defers to the Board's interpretation of a CBA, that deference is not limitless, and it is not warranted in this case for two main reasons. First, the Board's interpretation was not reasonable because it failed to apply regular principles of contract interpretation and instead incorporated contradictory federal civil liability standards on racial harassment and discrimination into the State's policies. Second, the Board's interpretation of the CBA was not entitled to deference as construing policies regarding racial harassment and discrimination are not within the expertise of the Board, resulting in an "unsupportable" construction. In re Gorruso, 150 Vt. 139, 143, 549 A.2d 631, 634 (1988).

¶ 27. As the majority concedes, a CBA is construed under principles of contract law, which require first looking at the plain language and the overall context of the agreement. See In re Cole, 2008 VT 58, ¶ 13, 184 Vt. 64, 954 A.2d 1307 ("[W]e look to the plain language of a contract to discern the intent of the parties."). The language of the policies here and the context of the agreement were sufficient, dispensing with any need to look beyond the CBA. See Beldock v. VWSD, LLC, 2023 VT 35, ¶ 28, __ Vt. __, 307 A.3d 209 ("If, in consideration of limited extrinsic evidence, no ambiguity is found, then the language must be given effect in accordance with its plain, ordinary and popular sense." (quotation omitted)). The State adopted policies prohibiting discrimination in the workplace on the basis of race, explaining that the prohibition included "all forms of mistreatment." The policies further explained that employees were precluded from discriminating against, intimidating, or harassing other employees because of race. The clear

15

purpose of these policies was both to protect the employer from civil liability for employment discrimination and to prevent harm to employees created by discrimination and harassment. See Vt. Dep't of Human Res., Person. Pol'y and Proc. Manual, Policy 3.3 Discrimination Complaints (July 1, 1999), https://humanresources.vermont.gov/sites/humanresources/files/documents/ Labor_Relations_Policy_EEO/Policy_Procedure_Manual/Number_3.3_DISCRIMINATION.pdf [https://perma.cc/5Y35-RBH2] ("The State of Vermont is opposed to discrimination and contractually and legally bound to prohibit unlawful discrimination in the workplace."). Thus, the policies benefitted both employer and employee and aimed to create a harmonious and welcoming atmosphere for all employees.

¶ 28. The deference afforded to the Board regarding matters within its particular expertise does not extend so far as to require this Court to accept the Board's interpretation of contract terms that ignores the purpose of the policies and incorporates inapposite federal law regarding civil suits for race-based discrimination. The Board holds no particular expertise regarding construction of the contract terms at issue here. Moreover, the federal law relied upon has been developed pursuant to a very different set of circumstances—namely, relief for those who have already faced discrimination, as opposed to prevention. This Court has declined to enforce the Board's construction of terms in a collective bargaining agreement where the construction was "unsupportable." Gorruso, 150 Vt. at 143, 549 A.2d at 634. I would do so here. If there is any ambiguity to the terms in the CBA and employer's policies, this Court looks at "the situation and motives of the parties, the subject matter of the contract, and the object sought to be attained by it." Id. The Board ignored these guiding principles, and its decision is therefore not entitled to deference.

¶ 29. There was no basis under the plain language of the employment policies or the purposes underlying them to import an intent requirement into the harassment and discrimination policies. The reason for these policies is not to punish an employee for malintent; it is to create a workplace free from discrimination. See, e.g., Disparate Impact, Black's Law Dictionary (11th ed.

2019) ("The adverse effect of a facially neutral practice (esp. an employment practice) that nonetheless discriminates against persons because of their race . . . that is not justified by business necessity. Discriminatory intent is irrelevant in a disparate-impact claim."). Therefore, the impact of the action, not the intent of the actor, is key. Discrimination and harassment on the basis of race have never required an intent to discriminate or harass and should be evaluated from an objective viewpoint. Regardless of whether grievant intended his comments to be racially insensitive, his actions caused harm to his coworkers. Requiring intent precludes discipline for a wide array of racially insensitive conduct, such as microaggressions, and thus places such behavior outside the protections of the CBA.[8] Grievant's attorney concedes that grievant's conduct constituted a microaggression, both in his briefing and at argument, contending that such conduct falls outside of the CBA's protections for racial discrimination and harassment. See Br. of Appellee at 21, 26, In re Miller, No. 23-AP-074 (May 19, 2023); see also Oral Argument at 13:02, In re Miller (Sept. 28, 2023) (No. 23-AP-074), https://www.youtube.com/watch?v=KPZplibaThU&t=821s (describing grievant's conduct as "a single, inadvertent, unintentional microaggression"). This interpretation of the CBA runs counter to its purpose of preventing racially insensitive conduct from occurring, regardless of the intent.

¶ 30. The unreasonable interpretation of contract terms by the Board also vitiates any deference this Court would typically give its decision. See In re Carnelli, 2020 VT 12, ¶ 13, 211 Vt. 522, 228 A.3d 990 ("[W]e owe deference if [the Board's] interpretation is reasonable."). Here, the Board's decision to use definitions from the Fair Employment Practices Act (FEPA), 21 V.S.A.

---

[8] "A common and frequently expressed form of modern discrimination can be communicated through microaggressions." A. Holder, Microaggressions: Workplace Interventions, in Microaggression Theory: Influence and Implications 261, 262 (Gina C. Torino et al. eds., 2019). The term "microaggressions," which was used by claimant's counsel to describe the conduct at issue in this appeal, is typically defined as "brief and commonplace daily verbal, behavioral, and environmental indignities, whether intentional or unintentional, that communicate hostile, derogatory, or negative slights and insults toward members" and reflect "the behavioral consequence of an agent's implicit bias against a structurally oppressed group." C. Friedlaender, On Microaggressions: Cumulative Harm and Individual Responsibility, 33 Hypatia 5, 6-7 (2018).

§ 495 et seq., and Title VII, 42 U.S.C. § 2000e et seq., was not reasonable. FEPA provides a floor of basic protections for all employees, while the CBA provides bargained-for supplemental protections, allowing an employer to correct harassing or discriminatory conduct before it could become the basis for a civil lawsuit. Incorporating the requirements of FEPA and Title VII will allow ongoing racial harassment and discrimination to go uncorrected until it is sufficient to meet the elements of a prima facie claim for civil harassment or discrimination. This was assuredly not the intent of the State or employees when they entered into the terms of the CBA. See Sutton v. Purzycki, 2022 VT 56, ¶ 37, __ Vt. __, 295 A.3d 377 ("A contract must be interpreted according to the parties' intent as expressed in the writing." (quotation omitted)).

¶ 31. The majority argues that this Court must give the Board "substantial deference" in matters which require interpretation of a CBA. Ante, ¶ 12. However, while I agree that deference is attributable to the Board's decisions in matters which engage its expertise as a regulator, federal courts, including both the United States Supreme Court and the United States Court of Appeals for the Second Circuit, have consistently held that deference to a Board's interpretation of a CBA is misplaced, and that only courts of law are empowered to interpret contractual provisions, including those of a CBA.[9] This makes considerable sense, especially given that the learned judges of

---

[9] Several federal appeals courts have since come to agree. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 202 (1991) ("Arbitrators and courts are still the principal sources of contract interpretation."); Int'l Bhd. of Elec. Workers, Loc. Union 43 v. NLRB, 9 F.4th 63, 71 (2d Cir. 2021) ("We do not . . . defer to the Board's interpretation of a contract, including a CBA"); Prime Healthcare Servs.-Encino LLC v. NLRB, 890 F.3d 286, 293 (D.C. Cir. 2018) ("Although the Board is authorized to interpret a collective bargaining agreement to resolve unfair labor practice charges, we owe 'no deference to the Board's interpretation.' " (quoting NLRB v. U.S. Postal Serv., 8 F.3d 832, 837 (D.C. Cir. 1993)); Loc. Union 36, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB, 706 F.3d 73, 82 (2d Cir. 2013) ("We do not . . . defer to the Board's interpretation of a contract such as a CBA because the interpretation of contract falls under the special, if not unique, competence of courts."); J. Vallery Elec. v. NLRB, 337 F.3d 446, 450 (5th Cir. 2003) (noting that deference "does not . . . extend to the Board's legal conclusions, including its interpretation of a collective bargaining agreement, which we review de novo."); NLRB v. Cook Cnty. Sch. Bus, Inc., 283 F.3d 888, 892 (7th Cir. 2002) ("[B]ecause interpretation of language in a collective bargaining agreement is characterized as a matter of law, our review of that interpretation is also de novo."); Quick v. NLRB, 245 F.3d 231, 240 (3d Cir. 2001) ("[T]he NLRB's legal interpretation of a collective bargaining agreement is not entitled to judicial deference."); Bonnell/Tredegar Indus. v. NLRB, 46 F.3d 339, 343 (4th Cir. 1995) ("No special deference is extended to the Board's

18

Vermont's own superior courts receive no such interpretative deference in their own matters of contract interpretation. B & C Mgmt. Vt., Inc. v. John, 2015 VT 61, ¶ 11, 199 Vt. 202, 207, 122 A.3d 511, 514 (2015) ("[T]he parties dispute the proper interpretation of their contract, which is a question of law that we review de novo."). While I do not dispute that some deference is warranted in evaluating the Board's decisions in general, the majority's deference to the Board here is legally unjustifiable based on the foregoing.

¶ 32. The majority additionally posits that because both FEPA and the CBA contain language forbidding the discrimination or harassment of an employee based on race, the two are analogous enough to merit reliance on FEPA, and in turn Title VII, for parsing the alleged ambiguity of the CBA. Ante, ¶ 16. However, "[t]his is not an instance where turning to federal law is necessary or appropriate" as a "comparison of the relevant provisions of the [CBA] with those of [FEPA and Title VII] suggests that, on this point at least, they are more different than they are alike." Vt. State Colls. Fac. Fed'n, AFT Loc. 3180, AFL-CIO v. Vt. State Colls., 138 Vt. 451, 454, 418 A.2d 34, 36 (1980). In fact, here, the CBA goes further than FEPA and Title VII, prohibiting discrimination additionally on the basis of "marital status, . . . workers compensation, nursing mothers (breastfeeding), credit history, flexible work-arrangements, parental and family leave," and union membership. Explicitly recognizing the parties' intentions to provide greater protections than FEPA, the CBA notes that "[m]any of the above forms of discrimination are unlawful under state and federal law," but "[a]ll are prohibited under the collective bargaining agreements." See Policy 3.3 Discrimination Complaints, supra, ¶ 27. This only further illustrates that the protections provided for in the CBA were meant to supplement those provided to all employees under FEPA, not mirror them, and further undercuts the Board's reliance on the statutory language to further its interpretation of the CBA.

interpretation of collective bargaining contracts."); Jones Dairy Farm v. NLRB, 909 F.2d 1021, 1028 (7th Cir. 1990) (noting that court "owe[s] the Board no special deference in matters of contractual interpretation").

¶ 33.    Even beyond the lack of comparable language shared by FEPA, Title VII, and the CBA, to endorse the Board's interpretation would cut against long-established canons of contract construction.  First, this Court "avoid[s] constructions which render ineffectual the language of a contract."  Furlon v. Haystack Mountain Ski Area, Inc., 136 Vt. 266, 269, 388 A.2d 403, 405 (1978).  Here, the Board's incorporation of the standards from FEPA and Title VII to define the meaning of "discrimination" makes meaningless the provisions of the CBA, which prohibit "all forms of mistreatment or denial of privileges based upon impermissible factors as established by . . . law."  See Policy 3.3 Discrimination Complaints, supra, ¶ 27.  Similarly, the Board's decision to attribute two different meanings to the term "harassment"—its FEPA definition in the racial context, and its commonly understood meaning in the general context—lacks a reasonable explanation.[10]  In construing contractual provisions, this Court must "give effect to every part of the instrument and form a harmonious whole of the parts."  Constr. Drilling, Inc. v. Eng'rs Constr., Inc., 2020 VT 38, ¶ 14, 212 Vt. 323, 236 A.3d 193.  The CBA, however, invokes federal law in provisions where that was the drafter's intention, noting that "29 U.S.C. § 2601 et seq., establishe[s] the rights and obligations of employees and employers" pertaining to family medical leave in Article 39.  This illustrates that had the drafters intended federal law to apply, they would have explicitly stated so, and the Board's decision fails to square the discrepancy between the inclusion and omission of these provisions.

¶ 34.    Additionally, the construction endorsed by the majority will lead to irrational results which are counter to the intent of the parties.  See Rockland Exposition, Inc. v. Great Am. Assur. Co., 746 F. Supp. 2d 528, 537 n.8 (S.D.N.Y. 2010) ("It is not uncommon for courts interpreting contracts to rely on the same principles that guide statutory construction."), aff'd, 445 Fed. App'x 387 (2d Cir. 2011); Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341,

_____

[10]  Notably, FEPA was amended in 2023 to disclaim the "severe and pervasive" standard applied by the Board here and required to prove race-based harassment under federal case law, stating "harassment and discrimination need not be severe or pervasive to constitute a violation of [FEPA]."  See 22 V.S.A. § 495(k)(1).

20

348, 816 A.2d 448, 454 (2002) ("This Court will always avoid a statutory construction which leads to absurd or irrational results."). By interpreting the definition of discrimination in the CBA to require "an adverse effect on the terms, conditions, or benefits of employment," Gallipo v. City of Rutland, 2005 VT 83, ¶ 17, 178 Vt. 244, 882 A.2d 1177 (quotation omitted), the majority opinion will greatly limit which conduct constitutes discrimination under the agreement. This Court has previously stated that while "[s]ome courts recognize that unchecked . . . co-worker harassment . . . may constitute adverse employment action," it has never adopted this view, and noted that to do so "would require more than derogatory comments by co-workers." Id. The consequences of the majority's holding would be to hamstring the State from taking action to correct behavior that is even more vulgar and racially charged than that at issue here. This benefits neither employer nor employee, in total contravention of the purposes of the CBA.

¶ 35. To achieve the goals of its policy, the State must be able to take corrective action when there is racially harassing or discriminatory conduct before it rises to the level of being legally actionable. The Board's interpretation, endorsed by the majority, will unfortunately preclude the State from intervening to confront harassment and discrimination until it becomes actionable. In essence, the State will be powerless to prevent racial discrimination and harassment claims through the workplace policies intended to do so, being left with only the option of litigating them in court, essentially ensuring the State's exposure to some form of liability. Additionally, because the State will be required to wait until conduct is sufficiently severe before initiating corrective action, it follows that the penalties imposed by the State at that point will be the harshest available. However, because this framework all but guarantees imposition of the harshest penalties, instructive corrective action such as additional training will be largely precluded. It would benefit both employer and employee if the State could address instances of racial harassment and discrimination through less-severe forms of corrective action.

¶ 36. Unintended consequences of this ruling will restrict the State's capability to remediate racial discrimination and harassment in the workplace. Worse, it may impede the small,

21

but hard-fought progress the State has made in its efforts to diversify its workforce. Commendably, the State has tried to ensure that Vermont is "more diverse and welcoming" to "attract and hire a high performing, diverse workforce." See Exec. Order No. 2-20, codified at 3A V.S.A. § 3-91 (2020); Exec. Order No. 4-18, codified at 3A V.S.A. § 3-87 (2018). Vermont has sought to implement these policy goals through a variety of legislative and executive actions, including the establishment of the Racial Equity Task Force and appointment of Vermont's first Director of Racial Equity. See Exec. Order No. 2-20. Despite this consistent effort, progress has been slow, with some employees of marginalized groups citing racism as an outsized hinderance. See, e.g., A. Guha, After Facing Racism at a Middlebury Middle School, a Departing Dean Calls for Stronger Protections, VTDigger (Sept. 21, 2023), https://vtdigger.org/2023/09/21/after-facing-racism-at-a-middlebury-middle-school-a-departing-dean-calls-for-stronger-protections ("My issue wasn't that these things happened, but that the leaders did not have protocols to follow to help guide them."). Affirming may only exacerbate the problem, potentially signaling to marginalized persons that some State agents do not really appreciate their struggles and will fail to protect them. For all these reasons, I respectfully dissent.

¶ 37. I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice
